## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| CHRISTOPHER WILSON, Individually<br>and on behalf of a class of persons similarly<br>situated, et al., | : | |
| | : | |
| | : | |
| Plaintiffs, | : | |
| | : | Case No.:  3:09-CV-00590 (JCH) |
| v. | : | |
| | : | |
| DIRECTBUY, INC., | : | |
| UNITED CONSUMERS CLUB, INC. and | : | |
| DIRECT BUY HOLDINGS, INC., | : | |
| | : | |
| Defendants. | : | April 26, 2011 |

## DEFENDANTS' RESPONSE IN OPPOSITION TO OBJECTIONS
## TO CLASS ACTION SETTLEMENT

The predominant theme of the objections is that the proposed settlement provides class members benefits of no value in consideration for their release of strong claims. These criticisms are badly wide of the mark, on both sides of the fairness equation: the benefits conferred in fact have real, significant value, and the claims that class members must surrender to obtain those benefits are all tenuous at best.

The objectors treat the allegations in the class action complaints covered by the settlement as gospel, but as Class Counsel repeatedly concede in their Motion for Final Approval, the actual facts paint a very different picture, full of fatal problems for every claim in the five complaints. This settlement does not give every class member what they might dream of, hope for, or feel that they deserve, but no class settlement does, and that is not the test for approval. Evaluated in light of the actual facts, not facile allegations, the settlement exchanges valuable benefits for an appropriately broad, comprehensive release of dubious claims, a release

necessary to provide defendants the global peace without which they would not have agreed to settle. That is the essence of a fair, reasonable and adequate settlement. *See In re PaineWebber P'ships Litig.*, 171 F.R.D. 104, 131 (S.D.N.Y. 1997) ("[T]he applicable standard for approval is whether the settlement is fair, reasonable and adequate, not whether it is perfect, or whether every Class Member receives an identical recovery."). The Court should overrule the various objections and grant Plaintiffs' Motion for Final Approval of Class Action Settlement.[1]

## I.      The Released Claims Are Extraordinarily Weak But the Settlement Nonetheless Provides Real Value to the Class.

Several objectors assert that the settlement is illusory because it provides class members with no value. *See* Ganezer Objection, Doc. No. 149; Gordon Objection, Doc. No. 155; Randall Objection, Doc. No. 157. For the reasons discussed below at pp. 15-19, these objectors are wrong: this settlement confers benefits of real value on every participating class member. The value of settlement benefits is, moreover, only part of the calculus in determining whether a settlement is fair, for as the Second Circuit has long recognized, "[i]n deciding whether to approve a proposed class settlement, the most significant factor for the district court is the strength of the claimants' case balanced against the settlement offer." *Plummer v. Chemical Bank*, 668 F.2d 654, 600 (2d Cir. 1982). Here, all the claims being settled, including the RICO claim in this case and the state law consumer protection claims that the proposed *amici* and the Randall Objection discuss at length, are so weak as to be of doubtful validity.

### A.      The Class Members' Allegations Have No Factual Basis.

The Hebert Objection, Doc. No. 167, identifies the five categories of allegations against Defendants in the five class actions ("Actions" as defined in the Settlement Agreement) and the

---

[1] This brief generally addresses only the objections filed by objectors with counsel, because those objections encompass the main points raised by pro se objectors. Defendants are prepared to address any specific pro se objections at the fairness hearing.

West Virginia Attorney General's complaint: 1) DirectBuy allegedly does not disclose prompt

payment discounts and cooperative advertising allowances despite some presumed duty to do so;

2) DirectBuy supposedly does not adequately disclose the existence of shipping and handling

fees; 3) DirectBuy's requirement of a "now or never" membership decision is assertedly an

unlawful practice; 4) DirectBuy allegedly improperly advertises its 30 day free membership and

purportedly falsely promised free gifts for attending an Open House; and 5) DirectBuy

supposedly does not provide members with the savings that it claims in its advertisements.[2]

None of these allegations has any basis in actual fact.

> ### 1.    The Disclosure of Prompt Payment Discounts, Cooperative Advertising Allowances and other Promotional Funds, and Shipping and Handling Fees.

Class Counsel explain at length in their Memorandum in Support of Motion for Final

Approval Class Action Settlement, Doc. No. 137, why the allegations in the Actions regarding

prompt payment discounts, cooperative advertising allowances, shipping costs, and handling fees

lack any factual basis.  Defendants will not repeat that entire dissection of the allegations here,

but certain facts warrant particular emphasis and attention.  First, DirectBuy has always

disclosed in its advertising, at its Open House presentations, and in its membership materials that

shipping and handling fees will apply to most merchandise purchases.  *See,* proposed *amicus*

brief, Doc. No. 161 Ex. 1 pp. 13, 19 (attaching a copy of the current Member Guide that

discloses shipping and handling costs and notes that these costs are discussed at the Open House

sales presentation).  For example, plaintiffs Regina and Gary Ingram's membership agreement—

like all others—states that "Members are entitled to order . . . merchandise . . . through said

---

[2] As this summary demonstrates, the allegations in these six cases all share the identical factual predicate, and are therefore properly covered by the release in the Settlement Agreement. *See* Defs.' Memorandum of Law Concerning the Scope of the Release, Doc. No. 204.

Center at the manufacturer's or supplier's price plus sales tax, freight charges and handling fee"
and, in a separately initialed section, "We have read both sides of this agreement. Freight
charges, sales taxes, and handling fees have been explained. . . ." *See* Doc. No. 137 Ex. 16.
Thus, Class Members have no basis for claiming that DirectBuy does not disclose that members
must pay shipping costs and handling fees for most merchandise.

    The allegations regarding the non-disclosure of prompt payment discounts and
cooperative advertising allowances are also misguided. The subject transactions are all industry-
standard practices that many manufacturers offer. More important, DirectBuy does not accept
any such discounts or allowances if declining them would result in a lower catalog price on the
merchandise to the members. Additionally, suppliers provide cooperative advertising allowances
and promotional funds for specific purposes—like the purchase of carpet samples, product
displays at DirectBuy locations, or advertisements in DirectBuy's Direction catalog. DirectBuy
uses those funds solely for the specified purposes. Any other use of those funds would violate
DirectBuy's arrangements with suppliers.

    The unfounded allegations in the Actions, which the objectors and the proposed *amici*
simply assume to be true, are that members are entitled to share in any prompt payment
discounts, for example. But that mistaken premise, which underlies every Action, is
fundamentally flawed, for a simple reason: what DirectBuy does with funds after a member pays
for a particular piece of merchandise is up to DirectBuy. Once a member places an order and
pays the supplier's catalog price, DirectBuy's obligation is to have the member's order filled. As
long as it does that, DirectBuy's cash management strategies are not the members' concern.
DirectBuy could choose to delay paying its suppliers and instead invest the funds paid by
members in the stock market, in municipal bonds, or in European sovereign debt. In any of those

4

scenarios, members could have no reasonable expectation of reaping the rewards of DirectBuy's

investments. Nor could DirectBuy have any reasonable expectation that members would pay

more for their merchandise if DirectBuy's investments turned a loss. Similarly, if DirectBuy

manages cash so that it pays a supplier invoice early, the member has no right to any early

payment discount, any more than DirectBuy has a right to demand that the member pay more for

merchandise if DirectBuy's cash management results in late payments and consequent late fee

charges from suppliers.

Moreover, the available evidence shows that members simply do not care that DirectBuy

may receive these allowances and discounts. Since 2009, when DirectBuy began disclosing[3] to

members that it receives and retains cooperative advertising allowances and prompt payment

discounts, no consumer to DirectBuy's knowledge has refused to join DirectBuy on account of

the information in those disclosures.

### 2.    DirectBuy Does Not Misrepresent Its 30 Day Free Trial Offer or Its Sweepstakes Promotions.

West Virginia Attorney General McGraw alleges that DirectBuy offers consumers a free

thirty day trial membership and the opportunity to win a $50,000 home makeover or other prizes,

but then does not allow consumers to take advantage of those promotions and otherwise

inaccurately represents the parameters of the trial offer to consumers. Doc. No. 107 Ex. 2 ¶¶ 99-

110. Mr. McGraw ignores that the written information provided to consumers about the thirty

day trial membership specifically states that the free membership allows the trial member to

spend a maximum of $1,000 on merchandise and imposes limitations on access to certain

---

[3] That DirectBuy changed its disclosure policy is immaterial to determining the strength of the class members' claims. At trial, evidence of the change in disclosures would be inadmissible. *See* Fed. R. Evid. 407; *see also Reynolds v. Univ. of Penn.*, 747 F. Supp. 2d 522, 534-36 (E.D. Pa. 2010) (holding that under Rule 407, plaintiff could not use changes to marketing materials to establish liability).

merchandise. *See* Thirty Day Free Trial Pass (attached as Exhibit 1).[4]  There is also no question that DirectBuy lets consumers use the thirty day trial memberships; since this promotion began, 54,374 people have taken advantage of the opportunity to sample what DirectBuy offers. *See* Affidavit of Bart Fesperman ¶ 2 (attached as Exhibit 2).

Finally, DirectBuy does in fact provide consumers with the promotional benefits discussed in its home makeover and other sweepstakes advertisements.  Since the makeover promotion began, 31 people have won the home makeover grand prize, and tens of thousands of people have received other prizes under that promotion. *Id.* at ¶ 3.  Over the years, DirectBuy has thus given away well in excess of $1,000,000 under its sweepstakes promotions. *Id.* at ¶ 4.  Here again, allegations in a complaint are just that—allegations.  They are not facts.  The Court should not measure the reasonableness of this settlement by comparing the settlement benefits to batches of unsubstantiated allegations; it should weigh the settlement benefits against the facts, which demonstrate no wrongdoing by DirectBuy.

### 3. Requiring Consumers to Make a Decision on Joining DirectBuy at the Open House Presentation Protects DirectBuy's Suppliers and the Value of the Membership.

Various class members have challenged DirectBuy's requirement of a so-called "now or never" decision to buy a membership during the Open House Presentation at its clubs. DirectBuy sells memberships by engaging consumers primarily through the use of direct response advertising requesting that consumers call for more information.  DirectBuy then schedules interested consumers to attend an Open House presentation at the nearest DirectBuy club, and also provides these consumers with a Visitor's Pass confirming their Open House appointments. *Id.* at ¶ 6.  The materials accompanying the standard Visitor's Pass specifically

---

[4]Notably, this document is part of one of the exhibits that Mr. McGraw attached to his complaint.

inform every consumer that "becoming a DirectBuy member requires your choice at the Open House you attend." A copy of the Insider's Guide included with the Visitor's Pass is attached as Exhibit 3. At the Open House Presentation, consumers attend an approximately 45-60 minute, partially scripted presentation by a DirectBuy representative, who provides a great deal of information about the DirectBuy membership and the benefits to the consumer of being able to buy from over 700 top brands without hidden retail markup. Fespman Aff. ¶ 7. Following that presentation, DirectBuy allows consumers to review its catalogs and the confidential supplier price sheets, so that they can see for themselves the undeniable savings that DirectBuy membership offers, and ask any other questions that they may have about the membership. DirectBuy then invites the consumer to purchase a membership and also asks him or her to come to a decision before leaving the club, or not be allowed back for an exclusionary period. *Id.* at ¶¶ 8-9. If a consumer decides to join, the consumer then reviews the membership agreement and membership guide with a DirectBuy representative, makes payment (by check or credit card, or the consumer may choose to finance), and signs the membership agreement. Throughout this sales process, DirectBuy provides consumers with entirely truthful information. *Id.* at ¶¶ 10-11.

DirectBuy has a valid business reason for requiring a membership decision from consumers before they depart the premises. The same 700 brands to which DirectBuy members enjoy access without hidden retail markup also have long-standing, well-established relationships with traditional retailers who represent their primary distribution channel. Unlike DirectBuy, retailers make their money by mark-ups on the prices of the goods they sell, not on membership dues. As noted above, during the Open House process, DirectBuy prospects have access to the confidential price sheets of DirectBuy's suppliers. If DirectBuy were to permit those prospects to leave without deciding whether to join, a consumer could take confidential

7

pricing information to the nearest retailer and demand that the retailer sell to him at the

DirectBuy price, under threat to go back and join DirectBuy to purchase the item at that same

price. The retailer in this scenario—which is in fact what gave rise to the decision rule at

DirectBuy many years ago—would rightly feel manipulated, and would complain to the

manufacturer to stop doing business with DirectBuy. Needing to protect their traditional and

predominant distribution channel, manufacturers are susceptible to such pressure from retailers.

If they succumb to that pressure, and discontinue their relationship with DirectBuy, the product

mix that DirectBuy offers shrinks, and the value of DirectBuy membership to the more than

400,000 current members in good standing erodes.

Thus, to protect both its suppliers and the members, DirectBuy does not permit

consumers to use its catalog showrooms as a form of public library at which to learn confidential

product prices, and instead requires its Open House guests to make their decisions about

membership at the Open House they attend. No one among the objectors, the proposed *amici,* or

West Virginia's Mr. McGraw cites any law that somehow mandates that DirectBuy—a private

club—must conduct its business so as to provide open public access to its catalogs and the

confidential supplier price sheets, all to the detriment of its 700+ suppliers and 400,000 members

whom DirectBuy's decision rule protects.

### 4.    DirectBuy Membership Provides Significant Savings.

Various causes of actions and objections assert that prices members enjoy through

DirectBuy are not competitive with traditional retail prices. Doc. No. 110; Doc. No. 157 p. 15;

Doc. No. 167 pp. 12, 21. No one, however, has submitted evidence that substantiates a claim

that DirectBuy falsely represents the savings that it offers. Conclusory assertions of this sort,

devoid of evidentiary backing, should not be allowed to derail this fair and reasonable settlement, which Magistrate Judge Garfinkel and counsel labored so hard for so long to accomplish.

The fact of the matter is that DirectBuy's prices, including shipping and handling, consistently beat the prevailing retail prices for like items. DirectBuy employs a talented group of buyers with many decades of experience in their respective industries, who negotiate with manufacturers to obtain the best possible pricing for DirectBuy members. Affidavit of Andy Morris ¶ 2 (attached as Exhibit 4). While the extent of savings compared to retail varies by product and category, it is often as much as 35% and more. *Id.* at ¶ 3.

DirectBuy also staffs a "Price Integrity" program from its corporate headquarters in Merrillville, Indiana. *Id.* at ¶ 4. Not only does DirectBuy generally monitor prices available in the marketplace to confirm that DirectBuy's prices do indeed beat publicly-available retail pricing, but when members bring to DirectBuy's attention that an identical item may be available at retail for a lower price for whatever reason (including loss-leader, product bundling, and other below-cost pricing strategies that retailers from time to time employ), DirectBuy also verifies whether the pricing issue is valid, and if so, works with the manufacturer at issue to ensure that members receive a better price through DirectBuy than what they saw at retail. *Id.* DirectBuy informs members of this program in its New Member Guide, Doc. No. 161 Ex. 1 p. 11 ("if you should ever find a lower price from a legitimate, local retailer on an identical item that is currently available from a DirectBuy Club supplier, even if it's an 'advertised special,' we will work with the supplier to obtain the best possible prices as quickly as possible.").[5]  DirectBuy

---

[5] DirectBuy also informs members that in certain limited product categories where there is little markup at retail, DirectBuy prices may be similar to those at retail. DirectBuy specifically identifies those products to the members. Doc. No. 161 Ex. 1 p. 11.

members thus do enjoy significant savings, and unsubstantiated assertions to the contrary warrant no meaningful consideration.

### B.    If Litigated, Plaintiffs' RICO Claims Will Fail.

Defendants believe that if they litigated these cases they would prevail, because the law is strongly in their favor.  For example, Plaintiffs here contend that DirectBuy, its franchisees, and Beta Finance Company (a corporate affiliate that finances DirectBuy memberships) constitute a RICO enterprise. *See* Compl., Doc. No. 1 ¶¶ 42, 57, 65.  Courts have consistently held, however, that a franchisor, its franchisees, and its corporate affiliates cannot, without more, comprise a cognizable RICO enterprise.  Indeed, the Seventh Circuit reached that very conclusion in an earlier suit against DirectBuy. *See Stachon v. United Consumers Club, Inc.*, 229 F.3d 673 (7th Cir. 2000) (affirming Rule 12(b)(6) dismissal of RICO complaint and holding that DirectBuy's parent, officers, past and present franchisees, manufacturers and wholesalers, and members do not satisfy RICO's enterprise requirement); *Fitzgerald v. Chrysler Corp.*, 116 F.3d 225 (7th Cir. 1997) (Posner, J.) (Chrysler and its dealers do not constitute a RICO enterprise); *Wooley v. Jackson Hewitt, Inc.*, 540 F. Supp. 2d 964 (N.D. Ill. 2008) (in dismissing RICO claim, holding that it would be "absurdly remote" from RICO's purpose to find that franchisor and franchisees constituted a RICO enterprise).

Another, independent reason why Plaintiffs' RICO claims are unlikely to survive a motion to dismiss or motion for summary judgment is their failure to identify a supposed pattern of racketeering activity distinct from the alleged RICO enterprise.  To state a cognizable RICO claim, not only must each defendant be distinct from the alleged enterprise, but the enterprise must also be distinct from the alleged pattern of racketeering.  "The 'enterprise' is not the 'pattern of racketeering activity'; it is an entity separate and apart from the pattern of activity in

which it engages." *United States v. Robinson*, 8 F.3d 398, 407 (7th Cir. 1993) ("If the 'enterprise' is just a name for the crimes the defendants committed, or for their agreement to commit these crimes that was charged separately in the conspiracy count, then it would not be an enterprise within the meaning of the statute . . . . Otherwise two statutory requirements— enterprise and pattern—would be collapsed into one."); *Whelan v. Winchester Prod. Co.*, 319 F.3d 225 (5th Cir. 2003) ("[P]redicate acts . . . committed by agents and officers of [defendant corporations] in the course of ordinary business" do not constitute a pattern of racketeering under RICO); *Delta Truck & Tractor v. J.I. Case Co.*, 855 F.2d 241 (5th Cir. 1988) (RICO's treble damages sanctions were "not intended to extend to fraudulent commercial transactions affecting interstate commerce."). The Seventh Circuit found the supposed pattern of racketeering activity alleged here to be fatally deficient in *Stachon v. United Consumers Club*, and the same outcome is probable in this case.

Above and beyond these legal arguments, Plaintiffs' prospects for proving the requisite predicate acts of mail or wire fraud are extremely dim, because DirectBuy did not make any misrepresentations, and even if it did, there was no intent to defraud. *See United States v. Walker*, 191 F.3d 326, 334 (2d Cir. 1999) (mail fraud requires proof of a "scheme to defraud" and proof of "fraudulent intent."). Even assuming that Plaintiffs could show that any of DirectBuy's representations amounted to a scheme to defraud, they would still have to demonstrate that the class members relied on the misrepresentations in making their purchase decisions. *See UFCW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121 (2d Cir. 2010) (decided after *Spencer v. Hartford Fin. Servs. Group, Inc.*, 256 F.R.D. 284, 306 (D. Conn. 2009), and explaining that, while reliance is not an independent element of a RICO claim predicated on mail fraud, plaintiffs would still have to prove reliance "as part of their chain of causation.") Thus,

Plaintiffs would have to prove that class members sustained losses in their business or property caused by not knowing that DirectBuy might receive cooperative advertising allowances and manage cash flow to receive prompt payment discounts.

If Plaintiffs are correct that the cost of membership is the measure of their alleged "loss"—in other words, that Plaintiffs need prove only "transaction causation" and not "loss causation" (*but see Holmes v. Secs. Investor Protection Corp.*, 503 U.S. 258 (1992), establishing loss causation as the proper measure)—they would also have to prove that they never would have joined DirectBuy had they known about discounts and allowances. Plaintiffs would therefore have to demonstrate that other reasons did not dictate why class members joined DirectBuy—*i.e.*, a friend's recommendation, the convenience of purchasing all furniture and home improvement items from one source, or the recognition that regardless of whether DirectBuy accepts industry-standard prompt payment discounts and advertising allowances, its products are still far cheaper than the competition. In short, there is little doubt that Plaintiffs' claims are highly suspect, and that weighs heavily in favor of approving the settlement. Since the claims against DirectBuy are flawed both factually and legally, a settlement reflecting the weakness of the claims is entirely reasonable.

## C.    The Randalls' Consumer Protection Claim, and Others Like It, Fare No Better Than the RICO Claims.

The Randalls' objection contends that the release does not adequately compensate class members for giving up their purportedly strong state law consumer protection claims, such as the cause of action under the Missouri Merchandising Practice Act ("MMPA") that the Randalls have pleaded in their Missouri state court complaint. *See* Randall Petition, Doc. No. 137 Ex. 21. An examination of the Randalls' claim, however, demonstrates that they are mistaken. To succeed on an MMPA claim, a plaintiff must allege and prove: (1) that he purchased

merchandise; (2) for personal, family, or household purposes; (3) that he suffered an
ascertainable loss; and (4) that the loss resulted from an unlawful practice. Mo. Rev. Stat. §
407.025.1; *Hess v. Chase Manhattan Bank*, 220 S.W.3d 758, 773 (Mo. 2007) (*en banc*). The
MMPA defines an "unlawful practice" as "any deception, fraud, false pretense, false promise,
misrepresentation, unfair practice or the concealment, suppression, or omission of any material
fact in connection with the sale or advertisement of any merchandise in trade or commerce."
Mo. Rev. Stat. § 407.020.1.

   The Randalls do not come close to satisfying this standard. One of their primary
allegations is that DirectBuy fails to disclose that members pay shipping and handling charges on
many items. *See* Randall Petition ¶¶ 35-41, 54(c)-(d). But the Randalls' own Membership
Agreement explicitly discloses these charges, as do DirectBuy's advertising, its New Member
Guide, and every one of the Randalls' 22 merchandise purchase orders. *See* Sample Randall
Purchase Order (attached as Exhibit 5); previously used New Member Guide (attached as Exhibit
6); Randall Membership Agreement (attached as Exhibit 7). DirectBuy thus made no incorrect
statement to the Randalls. *See Missouri ex rel. Ashcroft v. Wahl*, 600 S.W.2d 175, 180 (Mo.
App. 1980) (holding that statements made in course of selling membership to club did not violate
Section 407.020 because all the statements were true); *Page v. Fifth Third Bank*, No. 4:07-cv-
2085 SNLJ, 2009 WL 2252557, at *9-10 (E.D. Mo. 2009) (MMPA claim fails where statements
made to credit agency about defaulted lease were true); *Missouri ex rel. Nixon v. Progressive
Bus. Publ'ns, Inc.*, 504 F. Supp. 2d 699, 707 (W.D. Mo. 2007) (statement in a fax advertisement
saying it was sent in accordance with federal law did not violate MMPA because statement was
true).

The Randalls further allege that DirectBuy misled them by not disclosing that certain items of "merchandise purchased through a DirectBuy center might not be less expensive than similar or identical merchandise purchased elsewhere." *Randall* Petition ¶ 54(a). However, the New Member Guide in use in 2006 when the Randalls' joined disclosed this fact. *See* Ex. 6 p. 12. The Randalls do not assert, moreover, that the $20,000 worth of merchandise that they purchased through DirectBuy over the course of a year cost more than they would have paid for the identical merchandise at retail, nor would the facts support any such claim. After the Randalls sued, DirectBuy investigated their purchases and found that they saved, on average, 33% from the retail prices of the items that they bought. *See* Doc. No. 157 Ex. D. It is thus difficult to discern how the Randalls can seriously contend that they suffered any "ascertainable loss," or any injury at all. *See Freeman Health Sys. v. Wass*, 124 S.W.3d 504, 508 (Mo. App. 2004) (holding that plaintiff could not demonstrate an ascertainable loss for hospital overcharging him because he had not paid bills for the treatment he received); *see also Owen v. Gen. Motors Corp.*, 533 F.3d 913, 921 (8th Cir. 2008) ("the plain language of the MMPA demands a causal connection between the ascertainable loss and the unfair or deceptive merchandising practice," and a plaintiff complaining that the defendant failed to disclose an alleged product defect must show that he or she "in fact suffered that defect" or was harmed as a result of the alleged nondisclosure); *Werner v. Fidelity Invs. Life Ins. Co.*, No. 4:05-cv-2113 (CEJ), 2007 WL 1774515, at *3 (E.D. Mo. 2007) (finding that plaintiff's MMPA claim failed, among other reasons, because it did not allege that defendants' conduct caused him harm).

The Randalls try to avoid this gaping hole in their claim by arguing that, while DirectBuy represented that they would save 40-50% , they actually saved an average of only 33% on their extensive purchases using their membership. The Randalls have it wrong, and they misrepresent

DirectBuy's advertising in the process. That advertising accurately says that members can save "up to" 40-50%, but never guarantees 40-50% savings off the retail price on every purchase. *See* DirectBuy Advertisement (attached as Exhibit 8). For all these reasons, if litigated, the Randalls' MMPA claim would fare no better than Plaintiffs' RICO claim.

The proposed *amici* argue that because consumer protection laws generally do not require proof of fraudulent intent or reliance, class members' consumer protection claims are substantially stronger than Plaintiffs' RICO claims. The proposed *amici* fail to acknowledge, however, that the consumer protection statutes do require proof that an actual misrepresentation was made or that an unfair practice occurred, that the consumers suffered an injury, and that the defendant's unlawful act caused the consumer's injury. *See, e.g., Haesche v. Kisnner*, 299 Conn. 213, 224 (1994) (finding no violation of CUTPA because plaintiff could not connect his injuries to defendants' failure to warn); *Abrahams v. Young & Rubicam, Inc.*, 240 Conn. 300, 306 (1997) (explaining that CUTPA required plaintiff to show that defendant's prohibited act caused his injury); *see also* Doc. No. 161 pp. 28 n. 22 (collecting cases from various states showing that a plaintiff must prove either proximate cause or reliance under state consumer protection laws). As explained above, however, DirectBuy has made no actionable misrepresentations, and any causation argument on a state consumer protection act claim would suffer from the same infirmities as the Plaintiffs' RICO claim and the Randalls' MMPA claim, especially in the approximately eighteen states with statutes affording consumers three-day rights of rescission.

## E.    The Settlement Confers Benefits of Real Value on Participating Class Members.

The Ganezer, Randall, Hebert, and Dr. Vance objections all claim that the free membership periods have no value because (1) they would require class members to deal with a party that "wronged them"; (2) they would require class members to purchase merchandise to get

any benefit[6]; (3) there is no proof that purchasing through DirectBuy actually saves consumers money; and (4) DirectBuy will profit from any merchandise orders that class members place during the free membership periods. *See* Doc. No. 149 pp. 5, 9; Doc. No. 157 pp. 14-15, 20-21; Doc. No. 163 pp. 10-13; Doc. No. 167 pp. 12-13.

These objections, however, all erroneously assume that DirectBuy "wronged" class members, and also completely ignore the crucial facts about DirectBuy's membership renewal rates and order volumes, which demonstrate that many class members enjoy the value proposition that DirectBuy offers and affirmatively desire to continue doing business with DirectBuy. As explained above, the allegations of wrongdoing in this case have no merit. *Plummer*, 668 F.2d at 600 (strength or weakness of plaintiffs' claims most important factor in analyzing settlement.). First, except in rare intances the possibility of which is disclosed to prospective members, DirectBuy's prices are in fact significantly lower than retail prices for the 1,000,000+ products that it offers. *See* Affidavit of Amanda Fetch ¶ 2 (attached as Exhibit 9). While objectors cavalierly proclaim that DirectBuy does not actually offer savings, it bears repeating that the record is barren of any meaningful evidence to support this unfounded allegation.[7] Furthermore, DirectBuy will not earn a "profit" from "mark-ups" on merchandise

---

[6] The Ganezer objection contains a similar criticism that the free months have no benefit because class members can order merchandise right before their current membership expires. Doc. No. 149 p. 8. This objection (which by definition addresses only Tier 1 existing members) ignores that 75% to 80% of all current DirectBuy members will purchase a renewal of their memberships. Continued membership is thus obviously something that the vast majority of members considers to be valuable, which is why they pay their own hard-earned money to purchase it. Giving them two free months of a membership they would otherwise have to pay for provides significant value to this overwhelming majority of Tier 1 class members, many of whom have renewed their memberships many times. This Ganezer objection also disregards that even for the group of class member who would otherwise plan on making a purchase in the last moments of membership, having the additional two months to make that purchase still provides value. For example, it may give those class members additional time to consider which products to purchase, it may provide them time to make another "last second" purchase, and may allow them to purchase an item with cash instead of credit.

[7] The objectors who have purported to show that DirectBuy's prices are not competitive, are not comparing identical products from the same manufacturer. *See* Doc. Nos. 83, 93, 97, 110. Their argument thus embodies a fallacious *non sequitur* that because they feel they can find better prices on products other than those DirectBuy carries,

because, as already explained both above and in Plaintiffs' Motion for Final Approval, which was based on Class Counsel's painstaking review of volumes of DirectBuy purchase order and invoice documentation, DirectBuy does not mark up the prices for merchandise. And the baseless notion that this settlement is somehow a sophisticated DirectBuy marketing campaign ignores the harsh reality that the publicity surrounding the settlement, including the negative press associated with the proposed Attorneys General *amicus* filing—generated by the press releases of various Attorneys General, which repeat the florid but false allegations of the Actions, *see, for example,* the April 12, 2011 Press Release of Attorney General Jepsen (attached as Ex. 10)—has severely damaged DirectBuy's reputation.

Certain indisputable facts about the behavior of DirectBuy members further undermine these objections. During the class period, DirectBuy's membership renewal rate has ranged from 75% to 80%; to state the obvious, all of these DirectBuy members must have believed that the membership has value—otherwise there would be no reason to pay to renew. Also, it is clear that members make frequent use of their memberships: DirectBuy's approximately 400,000 active current members ordered merchandise worth well over $700,000,000 from DirectBuy corporate suppliers alone (which does not include the volume of orders placed with individual clubs' local providers) during DirectBuy's fiscal year ended July 31, 2010—an average of $1,750 per member. *See* Doc. No. 137 pp. 9, 14. No objector even attempts to explain why 400,000 people would spend close to a billion dollars a year using their DirectBuy memberships if DirectBuy offered them no savings.

---

DirectBuy's prices on the products it does carry must not offer savings. Stated otherwise, DirectBuy sells apples, but oranges are cheaper, so DirectBuy therefore provides no savings on apples. Such illogic certainly does not provide any basis for disapproving this settlement and the tens of millions of dollars of value it provides.

In addition, DirectBuy offers a wide variety of products at significant savings across a broad price spectrum. As explained in the affidavit of Amanda Fetch, members can purchase, for example, everyday items such as televisions, sinks, microwaves, and skillets, and in each instance enjoy meaningful savings compared to the retail price. *See* Fetch Aff. ¶ 5.[8] When, as here, a settlement provides frequent customers of the defendant with a non-cash settlement benefit that they can use to purchase a large selection of affordable items, courts have continually upheld the fairness of those settlements. *See Radosti v. Envision EMI, LLC*, 717 F. Supp. 2d 37, 46 (D.D.C. 2010) (finding that vouchers for tuition to attend defendants' programs had "meaningful value" because large percentage of class had attended more than one of the programs in the past); *In re Mexico Money Transfer Litig.*, 164 F. Supp. 2d 1002, 1019 (N.D. Ill. 2000) *aff'd* 267 F.3d 743 (7th Cir. 2001) (fact that class members often used defendants' money transfer services weighed in favor of settlement providing vouchers for discount on future money transfers); *Dupler v. Costco Wholesale Corp.*, 705 F. Supp. 2d 231 (E.D.N.Y. 2010) (approving settlement that provided members of a discount buying club with additional months of free membership); *see also Reibstein v. Rite Aid Corp.*, No. 09-2734, 2011 U.S. Dist. LEXIS 5282, at *34 (E.D. Pa. Jan. 19, 2011) (approving class settlement and finding that providing class members with gift cards was fair because, among things, class members were "(mostly) regular customers" and could use the cards to purchase "thousands of products for which ordinary consumers have need."); *In Re: Bisphenol –A (BPA) Polycarbonate Plastic Prods. Liability Litig.*, MDL No. 1967, 2011 U.S. Dist. LEXIS 2416, at *35 (W.D. Mo. Jan. 7, 2011) (MDL court preliminarily approving settlement and finding that settlement was fair because, among other

---

[8]Ms. Fetch's affidavit does not provide the names of specific manufacturers because doing so would be akin to releasing its confidential pricing information to the public. Defendants, however, will provide the Court for in camera review the actual pricing information that Ms. Fetch used.

reasons, vouchers could be used on a "wide variety of products"); *O'Keefe v. Mercedes Benz USA, LLC*, 214 F.R.D. 266 (E.D. Pa. 2003) (finding that vouchers for automobile oil change were fair because they did not obligate class members to long term relationship with defendant, all class members would eventually need oil changes for their cars, oil change is an inexpensive, routine purchase, and all class members have opportunity to use voucher).

The *Mexico Money Transfer* and *Costco* cases warrant particular attention. In *Costco*, the district court approved a settlement where plaintiffs alleged that Costco—another members only discount buying club—violated New York's consumer protection laws and deceived its members by inadequately disclosing the back dating of membership renewals. 705 F. Supp. 2d at 235. The district court found that the settlement, which provided for up to three months of free Costco membership, was fair because Costco had viable defenses and the membership extensions had a value of almost $38.8 million dollars.[9]

Similarly, the *Mexico Money Transfer* plaintiffs alleged that defendant violated RICO, and also asserted various state law claims, based on defendant's purported failure to disclose that it paid a different rate for pesos than it charged consumers at retail to exchange dollars for pesos. 164 F. Supp. 2d at 1007. The court approved a settlement providing class members with two discount vouchers on money transfers, reasoning that the vouchers would provide the class members with a real benefit because they frequently made money transfers to Mexico. *Id.* at 1018-19, 1028-29. In assessing the fairness of the settlement, the court observed that plaintiffs would encounter difficulty proving that defendant had a duty to disclose the existence of the exchange rate difference or that the failure to disclose this difference was a material

---

[9]The court noted that the calculations supporting this number were found in the motion for preliminary approval, 705 F. Supp. 2d at 241, and the preliminary approval brief calculated the value of the memberships the same way that Class Counsel did in this case. *See* Dupler Motion for Preliminary Approval pp. 12-13 (attached as Exhibit 11).

misrepresentation. *Id.* at 1014-15. Notably, citing the same difficulties on the merits of the plaintiffs' claims, the court rejected an objector's argument that the settlement improperly released an ostensibly stronger California statutory consumer protection claim. *Id.* at 1023-27. The Court should rely on the *Costco* and *Mexico Money Transfer* decisions to reject the groundless objections that the settlement fails to provide fair value to class members in consideration for the release of their claims.

> **F.      The Other Miscellaneous Objections to the Substance of the Settlement Fall Flat.**

> **1.      DirectBuy Does Not Routinely Give Away Free Memberships.**

The Ganezer objection claims, without citing any evidence, that DirectBuy often gives away free memberships. From this, Ganezer concludes that the settlement benefits have no value. Doc. No. 149. DirectBuy does not, however, routinely give away free periods of membership, and Ganezer's unsubstantiated assertion to the contrary misrepresents the facts. DirectBuy and its franchisees will occasionally offer a free membership renewal period or an accommodation on a particular merchandise order if a member has had a poor customer experience on an order or if the particular DirectBuy club location patronized by the member closes. *See* Fesperman Aff. ¶ 12. But such service failure recoveries are isolated responses to individual circumstances: DirectBuy has no general policy or practice of granting free membership renewals.[10] *Id.* at ¶ 13. Thus, the free and discounted membership renewal periods provided under the settlement do not represent the mere reoffering of something already available to Class Members, as the Ganezer Objection posits.

---

[10] From time to time, a DirectBuy franchise may offer a free first renewal when a consumer joins, as a value-added incentive to membership enrollment. Fesperman Aff. ¶ 14. DirectBuy franchisees do not, however, routinely offer free renewals to their existing membership base. *Id.*

## 2. The Free Membership Periods Provide Real Value Even Though They Are Not Transferable.

The proposed *amicus* brief and the Ganezer Objection assert that the free membership renewal benefits that participating class members receive should be transferable, Doc. No. 149 pp. 10-12, Doc. No. 161 p. 16, but they never bother to reconcile this contention with the undisputed fact that none of the over 800,000 DirectBuy Membership Agreements, which are the prerequisite to qualification as a Class Member to begin with, was *ever* transferable in the first place. *See* Ingram Membership Agreement, Doc. No. 137 Ex. 16 ("Members' rights, privileges, duties, and liabilities are not assignable and terminate upon death of the Members listed below."). Everyone who ever joined DirectBuy knew at all times that the membership was not transferable.[11] So, while transferability is sometimes a factor in approving class action settlement coupons and vouchers, it has no bearing on the present settlement.

In fact, it would be unfair to the current 400,000+ DirectBuy members in good standing if the periods of free renewal here were transferable while the 400,000+ Membership Agreements are not, because that would permit some transferee—who will likely pay for the renewal only a tiny fraction of what DirectBuy members in good standing paid to join—to take full advantage of a DirectBuy membership, possibly purchasing tens of thousands of dollars of merchandise under an inexpensive transferred renewal term, when current members in good standing paid $4,000 - $5,000 for the same privilege. Second, having never joined the DirectBuy members-only buying club, the transferees will have no incentive to comply with the commitment that every DirectBuy member in good standing has made to keep vendor pricing information strictly confidential, and not use it in an effort to negotiate lower prices from traditional retailers. *See* Ingram

---

[11] The exception is that except when husband and wife members each die during the same membership period, in which event the second decedent is permitted to bequeath the membership to an individual third party.

Membership Agreement ("Members agree that: All merchandise shall be purchased for Member's personal use or as a bona fide gift only and will not be purchased by Member for the purpose of resale, nor shall the Center's low price be disclosed to retailers.").[12]

As discussed above, abuse of the confidential pricing would seriously threaten DirectBuy's relationships with its suppliers and reduce the number of suppliers and products available to its 400,000+ members who have paid to be members. Considering these potential irrevocable harms not just to DirectBuy but also to 400,000 consumers who are current DirectBuy members, transferability would actually impair the fairness of the settlement. Whatever weight transferability might have in other circumstances, none should be accorded it here. *See also Costco*, 705 F. Supp. 2d 231 (approving settlement providing months of free membership without any indication that the benefits were transferable).

### 3. There are Valid Reasons for Providing the Same Benefits Regardless of Membership Length.

The proposed *amici* also object that the settlement is unfair because the benefits are the same no matter how long a class member has been a DirectBuy member. Doc. Nos. 152,161 p. 17. For three reasons, the idea that longer-term DirectBuy members should receive greater settlement benefits is misguided. First, while it is surely true that most class members who have been DirectBuy members longer have purchased more merchandise or membership renewals than other class members, this simply means that they have been able to earn even greater

---

[12]The current membership agreement contains the following language "DirectBuy occupies a unique position in the distrubition chain which enables us to provide our Members the opportunity to purchase directly from our vendors' confidential price lists. All DirectBuy pricing information is strictly confidential and you therefore agree to use the confidential pricing information in our vendors' catalogs only inside the Club . . . All of our valued vendors have well-established traditional wholesale and retail outlets for their distribution. We respect those long-standing relationships and you agree to respect them as well. Accordingly, you agree you will never use DirectBuy's confidential prices, or our Direction Magazine, to negotiate with stores, that you will never shop a store knowing that you will make your purchase through DirectBuy, and that you will never use retail personnel, or their services, unless you intend to buy from them." Sample Membership Agreement (attached as Exhibit 12).

savings, which makes their injury claims especially implausible. Second, the claims of many longer-term members would be barred by the statutes of limitations on the principal causes of actions that the objectors believe the class members could assert. *See, e.g., McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 233 (2d Cir. 2008) ("the statute of limitations for a civil RICO claim is four years."); Conn. Gen. Stat. § 42-110g(f) (CUTPA has three year statute of limitation after occurrence of violation); Tenn. Code. Ann. § 47-18-110 (1 year statute of limitations and 5 year statute of repose for private right of action under Tennessee Consumer Protection Act); *Boulds v. Chase Auto Fin. Corp.*, 266 S.W.23d 847, 851 (Mo. Ct. App. 2008) (MMPA has five year statute of limitations). Third, custom-tailoring settlement benefits to the duration of DirectBuy memberships would impose a significant, expensive administrative burden, which is not warranted given the overall weakness of all the Class Members' claims. Taking all the circumstances into account, the settlement should not be required to provide individualized benefits to each of the 800,000 class members.

<blockquote>

**4.     There Is Nothing Unfair to Former Members Who Have Lost All Rights to Renew, for the Settlement Nevertheless to Give Them the Opportunity to Renew for $200 a Year After Their Two Months of Free Membership.**

</blockquote>

A number of objectors argue that it is unfair for DirectBuy to charge $200 for the membership renewal after a Tier II Class Member's two free months expire. Among other things, objectors complain that the renewal price available to some of the Tier 2 Members before leaving DirectBuy was lower than $200, or that the renewal price should be the median, not the average, price of renewal. *See* Doc. Nos. 123, 146, 161 p. 12, 163 pp. 12-13.

These objectors again labor under misconceptions about the facts. Those Tier 2 Class Members who contend that $200 is an increase in the renewal amount provided in their DirectBuy membership agreements neglect the fact that in order to find themselves in Tier 2,

these DirectBuy members by definition no longer have a membership agreement with DirectBuy. For whatever reason, these Tier 2 Class Members dropped their memberships and therefore have no right to renew at all. They thus miss the mark by arguing that the settlement, while giving them renewal rights they had decided to relinquish, does so at a price sometimes higher and sometimes lower than what their forgone membership agreements may have provided. They also overlook the fact that if a DirectBuy member lets the membership lapse but later wants to renew, whether to permit renewal lies within the discretion of the franchisee from which the member purchased the membership, and when the franchisee allowss revival of a lapsed membership, the member normally must make up all the missed membership renewals. Thus, if a member did not renew for three years, the franchisee would require payment of three years of renewal dues before reviving the membership.

The settlement, however, confers the right to revive a membership without requiring the additional expense of paying the arrearages in renewal dues. That alone provides a valuable benefit. Second, the $200 renewal price is clearly fair to the Tier 2 Class Members. The median renewal price at all DirectBuy locations is $199.00 and the average renewal price is $202.43. This spread of $3.43 does not seem to justify the objectors' effort in bringing this issue to the Court's attention in the first place, and in any event, the $200 per year renewal amount for qualifying[13] Tier II members represents a fair and reasonable compromise.

### 5.    The Lack of Injunctive Relief Does Not Make The Settlement Unfair.

Some objectors complain that the settlement does not include injunctive relief requiring DirectBuy to disclose to future members that it may receive prompt payment discounts and

---

[13]The Settlement Agreement provides that only Tier II members who paid their original membership fee in full may renew after the two free months of benefits. Settlement Agreement ¶ III.D. This requirement prevents class members who did not pay the full membership dues from receiving the same benefits as those who met their obligations and paid in full, which would clearly be unfair.

cooperative advertising allowances from its suppliers. *See* Doc. Nos. 161 p. 19, 167 pp. 14-15. Because DirectBuy already makes this disclosure, this objection is moot—but it is also a makeweight. The release extinguishes only those claims of class members that arose before the Final Settlement Date. *See* Settlement Agreement ¶ III.E.1. After that date, if DirectBuy were to discontinue its disclosures relating to prompt payment discounts, freight charges, advertising allowances, or handling fees, or engage in any other conduct thought to be actionable, the release by its terms does not apply. It is thus in DirectBuy's own best business interests to continue making those disclosures in order to avoid unwanted follow-on waves of litigation. A "belt and suspenders" approach to include injunctive relief regarding DirectBuy's disclosures would add little, if anything, to the mix, in practical terms. The Court should reject this objection.

### 6. The Scope of the Release Is Appropriately Proportionate to the Weakness of the Claims Alleged in the Actions.

Several objectors charge that the release is too broad considering what they assume to be the strength of the class members' claims and what they conceive of as the purportedly illusory nature of the settlement benefits. Doc. No. 149 p. 13; Doc. No. 161 pp. 20-22; Doc. No. 167 pp. 20-21. As already explained, neither of these assumptions is correct. And so long as the Court finds that the class representatives have adequately represented the Class Members who will be releasing claims, and that the Settlement Agreement confers benefits commensurate with the strength or weakness of plaintiffs' claims, *In re Mexico Money Tranfer Litig.*, 267 F.3d at 748, the Court should reject this objection. Concluding otherwise would run afoul of the law's clear preference for the settlement of class actions and the recognition that broad class releases are necessary to reach that goal. *See In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 261 F.3d 355, 366-67 (3d Cir. 2001) (recognizing that refusing to grant a broad settlement release would undermine multi-district class settlements because defendants would be concerned that their

exposure to liability would be too great); *see also In re Gen. Am. Life Ins. Co. Sales Practices Litig.*, 357 F.3d 800, 803-05 (8th Cir. 2004) (recognizing that due to the general nature of settlements, a release of known and unknown claims in class action settlement in exchange for defendant's offered settlement benefits is proper). So, too, here, where DirectBuy's decision to settle these Actions derives from a desire to avoid the serious disruptions, expenses, and reputational harm that simultaneous litigation of five class actions would engender, and not from any reluctance to vindicate its business model and business practices on the merits, the release of all claims brought or which could have been brought in any of the Actions is completely fair and proper.

### 7.   The Settlement Is Fair and Reasonable Notwithstanding Class Counsel's Ill-Conceived Position Regarding the Scope of the Release.

Dr. Vance's objection asserts that the settlement is fundamentally unfair because the parties do not agree about the scope of the release. Doc. No. 163 pp. 18-20. A seasoned district court judge in Los Angeles recently rejected a similar objection, and this Court should do likewise.

In *Anderson v. Nextel Retail Stores, LLC*, No. CV 07-4480-SVW, 2010 U.S. Dist. LEXIS 43377 (C.D. Cal. Apr. 12, 2010), a member of the plaintiff class objected that a proposed class settlement purported to release claims that were not pleaded and that were the subject of a different class action that she had filed in Kansas. *Id.* at *5. In support of her position, the objector obtained a declaration from class counsel saying that "[w]e never intended" to include the objector's "factually distinct" claims in the settlement. *Id.* at *25. After providing this declaration, class counsel changed his position and filed a follow up declaration that the settlement did include the claims from the Kansas action. The court had no need to choose between class counsel's competing positions; instead, the court disregarded class counsel's

assertions about the scope of the release altogether, because "once parties entered in a fully integrated contractual agreement that is clear and explicit, their subjective intentions become irrelevant. At this stage of the proceedings, it is for the Court, not counsel, to decide whether the released claims in the Settlement Agreement are 'factually related' to the claims pled in the complaints." *Id.* at *26. Although the court acknowledged that class counsel's handling of this issue might raise questions about the adequacy of representation under Rule 23(a)(4), the Rule was satisfied because it requires "adequate, not perfect" representation of the class by counsel, and class counsel had otherwise vigorously prosecuted the actions and was thoroughly experienced. *Id.* at *41.

The situation is the same here: Class Counsel, who are experienced class action attorneys, took a foolish position in panic, see Doc. No. 128, but they did so long after the parties executed the settlement agreement and well after they had investigated the facts and negotiated the deal. Neither Class Members nor Defendants should pay a price for Class Counsel's mistaken March 22 filing, by having it become a basis for declining approval of the settlement. Class Counsel are simply wrong about the scope of the release, but in any event, their subjective view is immaterial in light of the signed settlement agreement. Like the others before it, this objection, too, has no merit.

**II.      Criticisms of the Proposed Class Representative Payments and Attorney's Fee Award Should Not Be the Basis for Disapproving the Settlement, and the Randalls' Advocacy of the Wholesale Pursuit of Numerous Lawsuits Against DirectBuy is Badly at Odds With Public Policy and Common Sense.**

Several objectors have challenged the adequacy of representation by the named class plaintiffs in this case and by Class Counsel, arguing that the class representatives should not receive individual payments and that the proposed attorney's fee award is excessive. *See* Doc. Nos. 98, 155, 157, 161, 163. The Settlement Agreement obligates Defendants not to object to

either the requested legal fees or the class representative payments, Settlement Agreement ¶¶ III.J.4-5, and Defendants are complying with that obligation. Defendants do urge the Court, however, if it finds that any of these objections to the class representative payments or proposed legal fee award have merit, to make what it believes are appropriate adjustments to these elements of the settlement, rather than rejecting the entire Settlement Agreement as unfair.

Defendants also feel compelled to respond briefly to the argument in the Randalls' objection that the Court should reject the proposed settlement in order to clear the field for a multitude of new lawsuits advancing state consumer protection law claims against DirectBuy. In support of this argument, the Randalls contend that state statutes like the MMPA "allow consumers to pursue relief on a class-wide basis against companies that have defrauded them, and to recover actual damages, punitive damages, and attorneys' fees." *See* Doc. No. 157 pp. 10-12. Later, the Randalls suggest that their lawsuit against a Missouri DirectBuy franchisee could yield $30,000,000 in damages and that, if similar actions were brought against all DirectBuy franchisees, the "true value of this litigation could be hundreds of millions of dollars." *See* Doc. No. 157 pp. 10-12, 19.

This objection lacks merit for two reasons. First, it does not adequately explain how the MMPA and other state consumer protection statutes would provide materially greater potential relief than a RICO claim. For example, the MMPA authorizes consumers to file a class action seeking to recover actual damages, punitive damages, and attorney's fees.[14] Mo. Rev. Stat. § 407.025.1; *see also* Cal. Civ. Code. § 1812.123(a) (providing for treble the actual damages and restitution plus attorney's fees). RICO allows consumers to recover virtually identical damages:

---

[14] The MMPA also authorizes equitable relief, see Mo. Rev. Stat. § 407.025, however, the Randalls base their argument solely on the availability of damages.

treble actual damages and attorney's fees. 18 U.S.C. § 1964(c). Under either statute, therefore, class members could seek to recover the full value of their memberships.

Second, many courts—including this one—have recognized the obvious point that hundreds of individual or state-wide class lawsuits are an inefficient and uneconomical means of resolving a nationwide dispute like the one now before the Court. *See, e.g., Spencer v. Hartford Fin. Servs. Group, Inc.*, 256 F.R.D. 284, 306 (D. Conn. 2009) ("[A]ny hypothetical interest in bringing individual suits does not outweigh the impracticability and feasibility of litigating many individual actions on the same facts."); *Petrolito v. Arrow Fin. Servs., L.L.C.*, No. 3:02-cv-484 (JCH), 2004 U.S. Dist. LEXIS 3978, at *31 (D. Conn. Mar. 5, 2004) ("the prospect of relatively small recovery on individual adjudications on identical issues with differing results makes the class form superior to individual litigation by class members.").

If the Randalls' envisioned scenario occurred—with various individuals filing putative class actions in courts throughout the country seeking eight figure damage awards from every DirectBuy franchisee, while other class members brought myriad individual suits seeking actual damages, statutory penalties, punitive damages and/or attorney's fee—there would be a rush to the courthouse by opportunistic plaintiffs' attorneys that, if even a small fraction were successful, would subject the DirectBuy franchise system to potentially insurmountable strain. *Denney v. Jenkens & Gilchrist*, 230 F.R.D. 317, 336 (S.D.N.Y. 2005) (thousands of individual suits, which would prompt a race to the courthouse by plaintiffs and potentially bankrupt defendant, was not superior method of resolving the dispute). Contrary to the Randalls' mistaken submission, this is another factor weighing on the scales in favor of settlement. *See In re Painewebber P'Ships Litig.*, 171 F.R.D. at 129 ("In particular, evidence that the defendant will not be able to pay a larger award at trial tends to weigh in favor of the approval a settlement,

since the prospect of a bankrupt judgment debtor down at the end of the road does not satisfy anyone involved in the use of class action procedures."); *Denney*, 230 F.R.D. at 338 ("If a higher judgment would excessively impact shareholders or would jeopardize a company's survival, this fact weighs in favor" of the proposed settlement).

## III.    The Settlement is Procedurally Fair.

### A.    The Parties Negotiated at Arms' Length and Plaintiffs Conducted a Thorough Investigation and Meaningful Discovery.

The proposed *amici*, Hebert, the Randalls, and Dr. Vance question the settlement negotiation process and the lack of formal discovery. Doc. No. 157 pp. 17-18; Doc. No. 161 p. 20; Doc. No. 163 pp.14-16; Doc. No.167 pp. 18-19. All these criticisms share one thing in common: They ignore that Judge Garfinkel closely supervised all aspects of the negotiations, including the confirmatory discovery process that Plaintiffs conducted before the parties finalized a binding settlement. As courts continually recognize, the involvement of a judicial officer in settlement negotiations strongly supports a finding that the negotiation process was fair. *See In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 577 (S.D.N.Y. 2008) ("Judge Weinstein's role in the settlement negotiations strongly supports a finding that they were conducted at arm's-length and without collusion."); *see also, e.g., In re Flag Telecom Holdings*, No. 02-cv-3400 (CM) (PED), 2010 U.S. Dist. LEXIS 119702, at *40 (S.D.N.Y. Nov. 8, 2010) ("The presumption in favor of the negotiated settlement in this case is strengthened by the fact that settlement was reached in an extended mediation supervised by Judge Weinstein."); *D.S. v. New York City Dep't of Educ.*, 255 F.R.D. 59, 75 (E.D.N.Y. 2008) ("Magistrate Judge Pollak's oversight and mediation of the parties' negotiations further support a finding of procedural integrity through the negotiations process."); *McBean v. City of New York*, 233 F.R.D. 377, 383-84 (S.D.N.Y. 2006) (supervision by the United States Magistrate Judge "goes a long way toward

assuring that the process was 'free of collusion or undue pressure.'"). None of the settlement's critics hazards any explanation how a settlement process they see as tainted could possibly have occurred under Judge Garfinkel's auspices.

Moreover, that the parties engaged in informal discovery instead of formal discovery plainly does not, as these critics assert, make the settlement process unfair or compromise Class Counsel's ability to assess the weakness of the claims. Courts have long recognized that "in view of the way [it] speeds the negotiation process, informal 'discovery' is to be encouraged." *Jones v. Amalgamated Warbasse House, Inc.*, 97 F.R.D. 355, 360 (E.D.N.Y. 1982). So long as the court "is assured that the parties had sufficient information about the claims to evaluate intelligently the desirability of settlement," *In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06-MD-1775 (JG) (VVP), 2009 U.S. Dist. LEXIS 88404, at *70 (E.D.N.Y. Sept. 25, 2009), courts routinely approve settlements where the parties undertook only informal or confirmatory discovery. *See, e.g., Campos v, Goode*, No. 10-Civ.-224 (DF), 2011 U.S. Dist. LEXIS 22959, at *12-13 (S.D.N.Y. Mar. 4, 2011) ("Here, through an efficient, informal exchange of information, Plaintiffs obtained sufficient discovery to weigh the strengths and weaknesses of their claims."); *In re Sony Corp. SXRD Rear Projection TV Mktg., Sales Practices & Prods. Liab. Litig.*, No. 09-MD-2102 (RPP), 2010 U.S. Dist. LEXIS 87643, at *17 (S.D.N.Y. Aug. 24, 2010) (noting that confirmatory discovery consisting of 19,000 pages of documents and interviews or depositions of nine witnesses satisfied the requirement that parties have engaged in discovery).

Here, Defendants provided Plaintiffs with thousands of pages of documents and allowed them to interview at length, with no prior conditions or restrictions as to scope, twelve members of DirectBuy's senior management (including a lengthy interview of DirectBuy's President and CEO in the United States Courthouse in Bridgeport), many of whom have now submitted

affidavits, reiterating under oath what they said in their interviews. In short, Plaintiffs had more than enough information to determine that the claims against DirectBuy—which Class Counsel started, and all the others have largely parroted—are unsustainable, and that this strenuously negotiated settlement is fair, reasonable, and adequate resolution of the doubtful claims asserted in the Actions. Moreover, Judge Garfinkel unquestionably shares that point of view, since he entered the order preliminarily approving the settlement. Doc. No. 65. No one has provided this Court any basis to come to any different conclusion.

**B.     An Experienced Class Action Administration Firm Sent Fully Adequate Class Notice.**

The Ganezer and Hebert objections challenge the adequacy of class notice because (1) it was set by e-mail instead of first class mail; and (2) the e-mail notice required the class members to click a link and enter a password, contained in the e-mail notice, to enter the settlement website. Doc. No. 149 pp. 13-14, Doc. No. 167 pp. 24-26. Defendants have already addressed these issues in their Response to Objection of the West Virginia Attorney General to Orders of Magistrate Judge Garfinkel and the accompanying Affidavit of David Isaac, Doc. No. 129 pp. 34-35 & Ex. 1. Defendants incorporate and rest on that submission, but will also respond to these objectors' contention that e-mail notice cannot suffice. That position might once have been correct, but it is now a relic of a bygone era. In this day and age, Courts routinely find that e-mail notice, supplemented by a mail notice for any class member without a valid e-mail address, is a proper method for disseminating class notice. *See, e.g., Radosti*, 717 F. Supp. 2d at 48; *Fulford v. Logitech, Inc.*, No. 08-cv-2041 MMC, 2010 U.S. Dist. LEXIS 29042, at *4 (N.D. Cal. Mar. 5, 2010); *In re Sony SXRD Rear Projection Television Class Action Litig.*, No. 06-civ-5173 (RFP), 2008 U.S. Dist. LEXIS 36093, at *11-12 (S.D.N.Y. May 1, 2008).

These objectors cite outmoded authority that identifies no persuasive reasons why electronic notice does not meet Rule 23's requirements. For example, Hebert cites *Thompson v. Midwest Foundation Independent Physicians Association*, 124 F.R.D. 154 (S.D. Ohio 1988), which antedates the advent of e-mail and thus, not surprisingly, does not address whether electronic class notification is acceptable, and *Reab v. Electronic Arts, Inc.*, 214 F.R.D. 623, 630 (D. Colo. 2002), which unconvincingly determined that because class members can forward e-mails easily, use of e-mails would confuse the notice process.[15] These objectors also cite *Karvaly v. Ebay, Inc.*, 245 F.R.D. 71, 72-81 (E.D.N.Y. 2007), where the Court, after determining that a class was not certifiable and the proposed settlement was not fair, gratuitously commented that Paypal could not distribute class notice to class members through their Paypal e-mail accounts. The *Karvaly* court, however,[16] noted that it was not foreclosing the possibility that it would approve an electronic notice program, if the parties later presented a certifiable class and fair settlement. *See id.* at 81.

The objectors have failed to establish that due process requires notice by first class mail or that e-mail notice in the 21st century inherently violates due process. The Court should overrule these objections.

---

[15] To the extent the *Reab* court articulates legitimate concerns about confusion arising from indiscriminate forwarding of e-mails, those concerns have no currency here, where, as noted, the DirectBuy class member must have and use a password and membership number.

[16] The objectors also cite *West v. Carfax, Inc.*, 2009 Ohio 6857 (Ohio App. 2009), where the Ohio Court of Appeals, following *Thompson*, held that first class mail, not e-mail, represented the "best notice practicable." *Id.* at p. 19. The dissent in that state-court case concluded to the contrary that "[u]nder the circumstances," it was "entirely appropriate and reasonable to provide notice to customers via e-mail." *Id.* at p. 44 (Grendell, J., dissenting). Because this panel of a state intermediate appellate court was divided and the majority failed to acknowledge, let alone discuss, the wealth of recent federal authority upholding e-mail notice, the *Carfax* case is of little to no persuasive value here.

C. **There Is Nothing Unfair or Unreasonable in Requiring Tier II Class Members to Submit a Simple Registration Form to Activate Their Settlement Benefits.**

The Hebert objection complains that the settlement is unfair because it required Tier II class members to submit a registration form. Doc. No. 167 pp. 13-14. First, it is questionable whether Hebert even has standing to raise this point, as he is a Tier I class member, not a Tier II class member. *See id.* at Ex. 1. But his Objection disregards both that DirectBuy is a private club where members pay a substantial membership fee in order to gain access to the confidential price sheets of DirectBuy's vendors, and that Tier 2 encompasses over 430,000 people. In fairness to existing members and to DirectBuy's suppliers, DirectBuy franchisees must verify that consumers entering their DirectBuy clubs are actually DirectBuy members, bound to confidentiality with respect to suppliers' confidential price sheets, before allowing them to review the vendors' catalogs and confidential price lists or to place orders; otherwise, membership would have no value. Accordingly, without the registration requirement for Tier II class members, DirectBuy and its franchisees would face a chaotic environment, with individuals essentially coming in off the street, claiming that they are members of the settlement class, and demanding to place orders. The registration requirement enables DirectBuy to identify the participating Tier 2 members in its computer system so that franchisees can quickly and efficiently identify individuals entitled to take advantage of the settlement. No one asserts that the registration form is burdensome, complicated, or confusing, and as stated, there are very sound reasons for its inclusion. This objection, like all the rest, is without merit.

**IV. Conclusion**

The contention that this settlement fails muster because it is purportedly light on benefits ignores that the allegations in the Actions are light on substance, both factual and legal. That the

34

settlement includes no cash payments to Class Members is a fair reflection of the manifold weaknesses of the Class Members' claims. And notwithstanding the absence of cash payments, many millions of dollars worth of benefits will flow to Class Members under this settlement. Criticisms that the payments to the class representatives and the fees requested by Class Counsel are out of alignment when Class Members receive only non-cash benefits are not proper grounds for rejecting the entire settlement, which suitably compensates class members given the dubious nature of their claims. As noted above, if the Court agrees with some or all of these criticisms, it should instead make what it regards as appropriate adjustments in the class representative payments, and should award fees to such counsel as deserve them in amounts the Court deems appropriate, within the limit that the Settlement Agreement imposes on the attorney's fee award.

Any class member who did not like the benefits the settlement would provide had an unfettered opportunity to opt-out—and over 700 did. Objections of fewer than 100 members out of a class of over 800,000 people (0.0125% of total Class Members) should not derail this fair and fairly negotiated settlement. This is especially true of the objections of the plaintiffs in the four other Actions. Their filings primarily reflect the unhappiness of the lawyers in the other cases that DirectBuy, which was motivated to negotiate by the desire to resolve all pending class actions, decided that its chances of success were higher if it negotiated with just one law firm, rather than trying to reach agreement with five competing sets of plaintiffs' attorneys, all jockeying for primacy. *See In re DirectBuy, Inc. Mktg. & Sales Practices Litig.*, 682 F. Supp. 2d 1349, 1350 (J.P.M.L. 2010) (noting complaint by certain counsel in the other Actions that "they were 'frozen out' of settlement discussions" in this case); *see also* Defendants' Memorandum of Law Concerning the Scope of the Release, Doc. No. 204 pp. 2-3.

The proposed settlement will provide valuable benefits to class members, reduce the docket burdens of the five courts where the settling class actions are pending, and allow DirectBuy to return its full attention to operating its business, the purpose of which is "to provide access to a better life." This settlement is fair, reasonable and adequate, and Defendants respectfully request that the Court approve it.

> **DEFENDANTS DIRECTBUY, INC.,**
> **UNITED CONSUMERS CLUB, INC.**
> **AND DIRECTBUY HOLDINGS, INC.**
>
>
> By:    /s/Edward Wood Dunham
>          Edward Wood Dunham (ct05429)
>          John Doroghazi (ct28033)
>          Wiggin and Dana LLP
>          One Century Tower
>          P.O. Box 1832
>          New Haven, CT  06508-1832
>          (203) 498-4400
>          (203) 782-2889 fax
>          edunham@wiggin.com
>          jdoroghazi@wiggin.com
>
>          *Attorney for Defendants*

## **CERTIFICATION**

I hereby certify that on April 26, 2011, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing.  Parties may access this filing through the Court's system.

/s/Edward Wood Dunham

Edward Wood Dunham