CHRISTOPHER WILSON, ET AL.,    :    CIVIL ACTION NO.
    Plaintiffs,    :    3:09-CV-590 (JCH)
    :
    v.    :
    :
DIRECTBUY, INC., ET AL.,    :    MAY 16, 2011
    Defendants.    :

### RULING RE: PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENT (Doc. No. 134) AND RELATED MOTIONS (Doc. Nos. 135, 136)

## I.    INTRODUCTION

On March 29, 2011, plaintiffs in this matter filed a Motion for Final Approval of Class Settlement (Doc. No. 134), as well as Motions for Attorneys' Fees and for Awards to the class representatives (Doc. Nos. 135, 136).  On May 10, 2011, this court conducted a fairness hearing, offering plaintiffs, defendants, and various objectors the opportunity to speak in support of or in opposition to the court's final approval of the class settlement agreement.  For the reasons articulated below, the court denies plaintiffs' Motions.

## II.    PROCEDURAL AND FACTUAL BACKGROUND

DirectBuy, Inc. ("DirectBuy") is a franchise members-only discount shopping club.  It has shopping centers throughout the United States and currently has over 400,000 members.  See Powell Aff. ¶¶ 2, 9, Mar. 28, 2011 (Doc. No. 137-2).  DirectBuy purports to offer its members products at manufacturer's or supplier's prices, resulting in major savings for its members by cutting out the retail markup.  See Compl. ¶ 34

(Doc. No. 1).  These products include a variety of furniture, home improvement products, and appliances.  Id. ¶ 24.  However, in order to receive this benefit, a customer must pay a sign-up fee of several thousand dollars and an annual renewal fee of around $200.  Powell Aff. ¶¶ 3, 5.  Doubtless members expect to recoup these fees in savings over the life of their membership.  See, e.g., P. Pelsinger Obj. (Doc. No. 70) ("I thought [the membership fee] was a lot but they convinced [me] I would make that money back through savings on our purchases.").

Within the last several years, a number of lawsuits have been filed in addition to this one, accusing DirectBuy of misrepresentation, fraud, and coercion.  See Compl., Vance v. DirectBuy, Inc., No. 1:09-cv-1360 (S.D. Ind. filed Jan 15, 2010) ("Vance Compl.") (Doc. No. 86-9); Compl., Swift v. Direct Buy, Inc., No. 1:09-cv-4067 (E.D.N.Y. filed Jan. 19, 2010) ("Swift Compl.") (Doc. No. 86-6); Compl., Ganezer v. DirectBuy, Inc., No. BC403076 (Cal. Super. Ct. filed Dec. 2, 2008) ("Ganezer Compl.") (Doc. No. 86-8); Compl., Randall v. Evamor, Inc., No. 09SL-CC03852 (Mo. Cir. Ct. filed Oct. 29, 2009) ("Randall Compl.") (Doc. No. 86-7).[1]  While each of these actions take a somewhat different approach, they are similar in substance.

A.    The Settled Causes of Actions

The instant lawsuit was brought by Christopher Wilson and nine other current and former DirectBuy members purportedly on behalf of a class of all current and

---

[1] All but the Ganezer action were filed after the instant case.  Plaintiffs' counsel were also involved in a case, Ponzi v. DirectBuy, Inc., No. 3:08-cv-1274 (D. Conn. filed Aug. 20, 2008), that was filed before the Ganezer action, but which was settled as an individual action.

former members of the club. Compl. ¶¶ 2-8. Plaintiffs allege that DirectBuy engaged in fraud by purporting to offer its members products "at the manufacturer's or supplier's price." Id. at ¶ 48. According to plaintiffs, DirectBuy failed to disclose "rebates, discounts, and other payments from manufacturers and suppliers," which plaintiffs claim amounted to approximately $8 million during the fiscal year ending in 2007, id. at ¶ 49 and a total of $53 million during the eight year class period, Klotzbach Aff. ¶¶ 3-5, Mar. 29, 2011 (Doc. No. 137-2).

Plaintiffs assert claims pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO"), averring that DirectBuy acted in collusion with its franchisees to engage in the alleged fraud. Compl. ¶¶ 40-69. Plaintiffs also assert a claim of unjust enrichment. Id. at ¶¶ 70-78.

The Settlement Agreement purports to settle four additional class action lawsuits brought throughout the country. See Settlement Agreement at 4-5, 12 (Doc. No. 64-1). These cases each bring claims that rely on facts nearly identical to those alleged in the instant action. See Vance Compl. ¶¶ 46-70; Swift Compl. ¶¶ 79-86, 93-96; Ganezer Compl. ¶¶ 12-15; Randall Compl. ¶ 54. Additionally, these other four cases allege that DirectBuy acted in violation of the law by charging excessive freight and handling fees. See Vance Compl. ¶¶ 66-68; Swift Compl. ¶¶ 68-78, 87-92, 94-96; Ganezer Compl. ¶¶ 16-17; Randall Compl. ¶¶ 54-55.

As the court understands it, none of these cases have had a class certified.[2] Unlike plaintiffs in this case, the other plaintiffs do not allege violations of RICO. Rather, two of the cases allege fraud, Vance Compl. ¶¶ 52-63, Swift Compl. ¶¶ 79-96; one case alleges breach of contract, Swift Compl. ¶¶ 68-78; and another includes an unjust enrichment claim, Vance Compl. ¶¶ 64-70. Additionally, three of the other cases allege violations of their states' consumer protection laws. Vance Compl. ¶¶ 46-51; Ganezer Compl. ¶¶ 25-45; Randall Compl. ¶¶ 51-57.

B.    The Procedural History of the Instant Case

The instant lawsuit was brought in this court in April 2009. See Doc. No. 1. Shortly after the suit was filed, the parties jointly requested a stay of all deadlines pending settlement negotiations, to be mediated by Magistrate Judge Garfinkel. See Doc. No. 14. This court granted that request, see Doc. No. 16, and, for nearly a year and a half, the parties engaged in settlement negotiations.

In December 2009, plaintiffs in one of the several parallel actions moved to intervene in this case in order to stay the settlement proceedings. See Doc No. 28. The interveners had filed a motion to the Judicial Panel on Mutltidistrict Litigation ("the MDL Panel"), seeking consolidation of four lawsuits pending against DirectBuy, including the instant case. Id. In February 2010, this motion was rejected by the MDL Panel. See Doc. No. 41.

---

[2] At least three of the cases have been stayed since 2010 based on DirectBuy's representation to those courts of a settlement in this case. See J. Randall & T. Randall Obj. 4 (Doc. No. 157) (Randall case stayed August 23, 2010); J. Swift, et al. Obj. 1 (Doc. No. 213) (Swift case stayed April 19, 2010); B. Vance Obj. 6 (Doc. No. 163) (Vance case stayed April 21, 2010).

Settlement negotiations continued in this case until, on December 9, 2010, plaintiffs and defendants filed a Joint Motion for Preliminary Approval of Class Settlement (Doc. No. 64). In light of the court's prior referral of the settlement proceedings to Judge Garfinkel, and given his familiarity with the case, the court verbally requested Judge Garfinkel to handle the preliminary approval.[3] On December 14, 2011, Judge Garfinkel granted the Motion for Preliminary Approval. See Doc. No. 65.

From January through April 2011, the court received a number of objections, filed pro se and represented, to the terms of the Settlement Agreement, as well as an amicus brief filed by the attorneys general of thirty-seven states,[4] the District of Columbia, and Puerto Rico. See Doc. No. 161. A Hearing took place on May 10, 2011, where parties and objectors were given an opportunity to express their views as to the fairness, adequacy, and reasonableness of the settlement. See Doc. No. 239.

C.      The Terms of the Settlement Agreement

The settlement class is defined to include current and former DirectBuy members during the time period from October 11, 2002, until the date the Settlement Agreement was preliminarily approved, December 14, 2010. See Settlement

---

[3] In retrospect, the court was mistaken in not making a written referral to Judge Garfinkel for a Report and Recommendation on the Preliminary Approval.

[4] These states include, Alaska, Arizona, Arkansas, Colorado, Connecticut, Delaware, Florida, Georgia, Idaho, Illinois, Iowa, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nevada, New Hampshire, New Mexico, New York, North Dakota, Ohio, Oklahoma, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Washington, and West Virginia.

Agreement at 5.  This definition includes approximately 410,000 current members and

430,000 former members.  <u>See</u> Powell Aff. ¶ 9.

The Settlement Agreement purports to settle:

> all claims, demands, rights, causes of action, judgments, executions, damages, liabilities, and costs or expenses of any kind relating to the Actions (including attorney's fees and court costs), in law or equity, known or unknown, suspected or unsuspected, fixed or contingent, arising out of or related to claims based on events, transactions, or occurrences taking place at any time before the Final Settlement Date, that were brought, or could have been brought, in the Actions.

Settlement Agreement at 12.  "Actions" is defined to include the instant case and each

of the four cases discussed, <u>supra</u>.  <u>Id.</u> at 4-5.

In exchange for this release, the class will receive, at minimum, two free months

of membership.  <u>See id.</u> at 10-11.  Current members will automatically receive this

benefit, whereas former members need to contact DirectBuy to obtain any benefit.  <u>Id.</u>

Additionally, current members have the option to purchase renewals in advance and

receive additional months free.  <u>Id.</u> at 10 (offering four free months with the purchase of

a two year renewal, and offering one free month with the purchase of a one year

renewal).

## IV.    STANDARD OF REVIEW

A district court must review the terms of a proposed class action settlement to

ensure that it is "fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2); <u>McReynolds</u>

<u>v. Richards-Cantave</u>, 588 F.3d 790, 803 (2d Cir. 2009).  This analysis is usually divided

into two steps.  First, a court will analyze the procedural aspects of the settlement to

determine whether the nature of the settlement proceedings give rise to concerns of procedural unfairness. Id. at 803-04. A presumption of fairness will arise, where "'a class settlement [is] reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery.'" Id. at 803 (quoting Wal-Mart Stores, Inc. v. Visa U.S.A. Inc., 396 F.3d 96, 116 (2d Cir. 2005)) (alteration in original).

Second, a court will consider the substantive fairness of a settlement agreement, utilizing the nine factors articulated by the Second Circuit in City of Detroit v. Grinnell Corp., 495 F.2d 448, 454 (2d Cir. 1974), abrogated on other grounds by Goldberger v. Integrated Res., 209 F.3d 43 (2d Cir. 2000). These factors include:

> "(1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation."

McReynolds, 588 F.3d at 804 (2d Cir. 2009) (quoting Grinnell, 495 F.2d at 463). "When a settlement is negotiated prior to class certification, as is the case here, it is subject to a higher degree of scrutiny in assessing its fairness." D'Amato v. Deutsche Bank, 236 F.3d 78, 85 (2d Cir. 2001).

The attorneys general, in their amicus brief, argue that the Class Action Fairness Act ("CAFA") requires an even higher degree of scrutiny in the event of a coupon settlement. See Synfuel Techs., Inc. v. DHL Express (USA), Inc., 463 F.3d 646, 651 (7th Cir. 2006) ("CAFA . . . require[s] heightened judicial scrutiny of coupon-based

settlements based on [the] concern that in many case 'counsel are awarded large fees, while leaving class members with coupons or other awards of little or no value.'" (quoting Pub. L. 109-2, § 2(a)(3)(A), 119 Stat. 4, 4)). However, although CAFA added a number of different procedural requirements with respect to coupon settlements, <u>see</u> 28 U.S.C. § 1712 (placing limitations on class fee awards, and requiring court to make a finding of fairness in writing), the language used to describe the standard of a court's review is the same as that found in Rule 23, <u>compare</u> <u>id.</u> § 1712(e) (requiring finding that the settlement be "fair, reasonable, and adequate" for class members), <u>with</u> Fed. R. Civ. P. 23(e)(2) (requiring the same).

The court agrees that this in-kind settlement does indeed resemble a coupon settlement. However, the court is already required to carefully scrutinize the proposed settlement under <u>D'Amato v. Deutsche Bank</u>, because this settlement precedes class certification. 236 F.3d at 85. Therefore, the court does not need to reach the question of whether CAFA altered the standard of review found in Rule 23 for such a settlement.

## V.     DISCUSSION

A.     <u>Procedural Fairness</u>

As an initial matter, the court must determine whether the process of settling the case was such that a presumption of fairness would be appropriate in this case. <u>See</u> <u>McReynolds</u>, 588 F.3d at 803. Such a presumption "may attach to a class settlement reached in arm's length negotiations between experienced, capable counsel after meaningful discovery." <u>Wal-Mart Stores</u>, 396 F.3d at 116. This case involves facts

that, on the one hand, might suggest procedural fairness.  On the other hand, in light of the early stage of the litigation and no formal discovery, a presumption of substantive fairness does not appear appropriate at this point.

The parties in this case did engage in what appears to be intensive negotiations. See Mem. to Counsel from Magistrate Judge Garfinkel (Doc. No. 137-3).  The settlement process took well over a year.  Further, Judge Garfinkel mediated much of the negotiations and reports that they were hard fought.  See id. at 1 ("DirectBuy has been a tough adversary and, at times, a difficult negotiation partner.").  Judge Garfinkel, in his Memorandum recommending attorneys' fees, notes that the plaintiffs are represented here by highly capable and assertive counsel, suggesting that any settlement terms were the product of a truly adversarial process.  See id. at 2 ("The quality of the representation Class Counsel provided to their nationwide clients was at the highest level.  They brought great ability, experience, and diligence to their work."); see also D'Amato, 236 F.3d at 85 (noting that the involvement of a Special Master during the negotiation process "help[ed] to ensure that the proceedings were free of collusion and undue pressure").

Nonetheless, the court is concerned with the limited amount of discovery conducted prior to settlement, and the nature of the discovery that has been conducted. See McReynolds, 588 F.3d at 803 (requiring "meaningful discovery" for presumption of fairness to apply).  While plaintiffs report having conducted interviews and reviewed thousands of documents, none of this is before the court, nor do the interviews nor the

responses to discovery appear to have been conducted under oath.  See Plummer v. Chem. Bank, 668 F.2d 654, 658 (2d Cir. 1982) (noting that, due to the lack of formal pretrial discovery, the district court was required to carefully analyze the proposed settlement).  Although plaintiffs produced a number of sworn affidavits by DirectBuy employees in support of their Motion, see Doc No. 137-2, these affidavits are short and carefully worded and do not include any supporting documentation.

In light of this limited discovery, the court will not grant this Settlement Agreement the presumption of fairness that might normally adhere when settlement comes later in a case.  While an early settlement can certainly produce fair results for class plaintiffs, there are serious risks to absent class members that their released claims have been undervalued when class counsel accepts an early payout.  See Plummer, 668 F.2d at 658 ("Although negotiations in the instant case were conducted by undesignated class representatives without formal pretrial discovery, this, standing alone, did not preclude judicial approval.  However, the district judge was bound to withhold such approval until he had closely and carefully scrutinized the joint settlement proposal to make sure that it was fair, adequate and reasonable, and not influenced in any way by fraud or collusion.").

B.    Substantive Fairness

1.    Scope of Release

As an initial matter, the court must address the scope of the release.  Plaintiffs and defendants sharply disagree about what claims are and are not released by the

Settlement Agreement. Defendants argue that the release extends to all claims based on any facts alleged in the instant Complaint or any of the four complaints settled by the Agreement. See generally Defs.' Mem. Re: Scope of Release (Doc. No. 204). Plaintiffs, however, urge a narrower construction of the release as reaching only claims that were brought or could have been brought as class actions in the five relevant lawsuits. Pls.' Mem. in Support of Final Approval at 38 (Doc. No. 137); Pls.' Reply to Obj. 16-28 (Doc. No. 206). Plaintiffs further argue that Rule 23 acts to bar the release of claims that could not be brought as part of a cohesive class action lawsuit. Id. at 4-5.

In analyzing the fairness of the Settlement Agreement below, the court will assume the narrower reading of the release is the correct one. Even under plaintiffs' reading of the Agreement, a substantial number of claims are foreclosed by this settlement. Specifically, any claim, whether brought pursuant to state or federal law—based on the same factual predicate as the operative claims in the five complaints[5]—is to be released. See Settlement Agreement at 23 (releasing all claims that "were brought, or could have been brought, in the Actions"); see also Wal-Mart Stores, 396 F.3d at 107 ("The law is well established in this Circuit and others that class action releases may include claims not presented and even those which could not have been presented as long as the released conduct arises out of the 'identical factual predicate'

---

[5] While a couple of the complaints allege facts regarding DirectBuy's high pressure sales tactics, see Ganezer Compl. ¶ 16; Randall Compl. ¶¶ 12-23, plaintiffs argue that these facts are extraneous to the actual claims brought by the five complaints—namely, claims that DirectBuy failed to disclose and disseminate various rebates and discounts received from manufacturers, see, e.g., Compl. ¶ 48, and claims that DirectBuy utilized freight and handling fees to overcharge its members, see, e.g., Vance Compl. ¶ 66-68.

as the settled conduct." (quoting <u>TBK Partners, Ltd. v. W. Union Corp.</u>, 675 F.2d 456, 460 (2d Cir. 1982)).  These claims include, at minimum, any claims relying on allegations that DirectBuy failed to disclose various rebates and discounts received from manufactures and suppliers and allegations that DirectBuy failed to disclose the nature and size of its freight and handling fees.  <u>See, e.g.</u>, Compl.  ¶ 48 (alleging defendants engaged in fraud by purporting to offer its members products "at the manufacturer's or supplier's price"); <u>Vance</u> Compl. ¶¶ 66-68 (alleging that DirectBuy was unjustly enriched by "charging and collecting unreasonable and exorbitant shipping and handling fees").

2. Nature of Benefit

There is also sharp disagreement about the nature of the benefit received by the class pursuant to the Settlement Agreement.  Plaintiffs argue that the court should treat the settlement as being equivalent to the approximate cash value of the two months membership offered to class members.  <u>See</u> Pls.' Mem. in Support at 24-26.  They estimate that, on the low end, this settlement can be valued at around $19.5 million and, on the high end, worth $55 million.  <u>Id.</u>  Objectors contend, however, that the settlement resembles a coupon settlement which provides little or no value to class members.  <u>See</u> State Attorneys General Brief <u>Amicus Curiae</u> at 6-7 ("AGs' <u>Amicus</u>") (Doc. No. 161).  The court agrees with objectors.

The instant Settlement Agreement shares many characteristics with the infamous "coupon" settlement.  <u>See</u> Nat'l Ass'n of Consumer Advocates, <u>Standards and</u>

Guidelines for Litigation and Settling Consumer Class Actions (2d ed. 2006), 255 F.R.D. 215, 235 ("[T]he considered view today is that unless a coupon settlement provides increased benefits to class members and possesses certain safeguards, they should generally be avoided . . . .").[6]  Instead of a cash payout, DirectBuy offers class members an in-kind benefit—continued or renewed membership.  See Synfuel Techs., 646 F.3d at 654 (noting that in-kind compensations are generally cause for scrutiny).  As with most in-kind benefits, the dollar amount ascribed to the benefit does not represent its actual cost to DirectBuy.  See, e.g., Clement v. Am. Honda Finance Corp., 176 F.R.D. 15, 26-27 (D. Conn. 1997) (disapproving settlement, and noting that coupons operated as "a sophisticated . . . marketing program" for defendant).  DirectBuy receives a clear benefit by maintaining its members for as long as possible, and this settlement might well result in an increase in DirectBuy's membership base.  The company might, for example, within the two free months, convince a wavering member to sign up for another year with the club.  An even greater benefit might be had as a result of former members temporarily returning to DirectBuy.  DirectBuy could reap further gain as a

---

[6] The National Association of Consumer Advocates Guidelines list a number of circumstances where coupon settlements may be appropriate, including:

> (1) if the primary goal of the litigation is injunctive and the defendant agrees to an injunction, or the certificates are good for the purchase of small ticket consumable items which class members are likely to purchase, or the certificates represent true discounts that would not otherwise be available, (2) where the certificates are freely transferable, (3) where the coupons are in addition to and can be added to any already-existing coupons or sales incentives, (4) where the coupons should be stackable (i.e., a consumer can use more than one in a transaction); and (5) where there is a market-maker to insure a secondary transfer market.

Nat'l Ass'n of Consumer Advocates, supra, 255 F.R.D. at 236.  Needless to say, none of these circumstances is present here.

result of any purchases made, by way of handling fees and some freight charges.

Additionally, the value to the class is often overstated when an in-kind award is made. See Synfuel Techs., 463 F.3d at 654 ("'[C]ompensation in kind is worth less than cash of the same nominal value . . . .'" (quoting In re Mex. Money Transfer Litig., 267 F.3d 743, 748 (7th Cir. 2001) (first alteration in original)). Two months free membership is only of value if a member has an interest in retaining her membership and actually purchases something. Seventy-five percent of DirectBuy members renew every year. Powell Aff. ¶ 8. This means that a full twenty-five percent of current class members will receive no benefit from the settlement in question. See, e.g., J. Camillieri Obj. (Doc. No. 77) ("I object to the settlement terms because I no longer require the services of DirectBuy. Receiving a free two month membership does not provide me with any remuneration."). Further, assuming that nearly all former members have no interest in continued membership—which could be inferred from the fact that only five percent of former members are seeking to participate—more than half the class appears to be without a benefit.[7] See, e.g., R. Merillat Obj. (Doc. No. 78) ("I am objecting to the settlement for the same reason that I discontinued participating with DirectBuy as a consumer. . . . As I have decided long ago not to buy from DirectBuy, I believe that the two months of free membership is ludicrous.").

Even for the seventy-five percent of current members who are likely to renew,

---

[7] This settlement might have had some value to these class members, had the benefit been transferrable. See Clement, 176 F.R.D. at 28 ("The value of these coupons is too speculative. Absent a transfer option or other guaranty of some minimal case payment, there is a strong danger that the settlement will have absolutely no value to the class.").

based on historical experience, plaintiffs' estimation of the valuation is not entirely reasonable. The court lacks any information about the purchasing patterns of DirectBuy members throughout the year. The fact that one year's worth of membership may be reasonably valued at $200 does not necessarily mean that a monthly membership is worth $17. If members tend to purchase infrequently, as opposed to regular monthly purchases, many class members would receive no value from the settlement because their purchasing habits may be such that the two free months will result in no savings.

For these reasons, the court is of the view that, at a theoretical best, the settlement might have a value of between $15 million and $27 million, to some fraction of current and former members, and may well be worth much less even to them. The $15 million estimation is based on the assumption that seventy-five percent of current members (around 300,000 members) value their membership at $16.67 per month and would be interested in renewing for one year, receiving a total of three free months of membership.[8] The $27 million number additionally assumes that seventy-five percent of the original seventy-five percent (around 225,000 members) would be interested in renewing for two years, receiving six months free membership instead of three, and assumes that the 22,636 former members who wished to partake in the settlement also valued their membership at $16.67. These numbers are obviously very rough, and very likely inflated, but will serve as a guide to the court when it considers the adequacy of

---

[8] As discussed above, this is not the only reasonable assumption, nor is it in the court's view the most reasonable assumption.

the settlement below.

        3.     <u>Grinnell</u> Factors

A district court must consider a number of factors when determining whether a particular settlement is substantively fair.  <u>See</u> <u>Grinnell</u>, 495 F.2d at 463.  As discussed in detail below, each factor is either neutral or weighs against a finding of fairness in this case.

        a.     Complexity, Expense, and Likely Duration of Litigation.

This does not strike the court as a particularly complex case.  Rather, claims are based on relatively straightforward contract claims and derivative claims in various consumer protection statutes and, in the instant case, RICO.  Based on the description of the conduct in question, discovery should be relatively straightforward, as class actions go.

Plaintiffs' contention that RICO is a difficult claim to pursue is a bit of a red herring.  Although plaintiffs in this particular case opted to pursue claims under that statute—likely due to the treble damages available to a prevailing party and a potential national class—none of the other four cases chose that route.  Instead, these cases were brought pursuant to well-known common law causes of actions, such as breach of contract, fraud, and unjust enrichment, as well as various state consumer protection statutes.  <u>See, e.g.</u>, Vance Compl. ¶¶ 46-63.  Had the parties here sought only to settle claims under RICO, the consideration of the difficulty of bringing such claims, as plaintiffs and defendants suggest, would be reasonable.  Here, however, parties ask for

approval to settle <u>all</u> of the aforementioned common law and consumer protection claims.  Therefore, the nature and complexity of these claims must be considered by this court prior to any such approval.

The court does note that this case has been pending for nearly two years.  However, the parties have been in settlement negotiations the entire time.  Managed well, the court does not expect this litigation to last an inordinately long time as compared to other class actions which the court has overseen.  While this view of the litigation does not necessarily weigh against a denial of any settlement agreement, it does argue against discounting the value of plaintiffs' claims, based on a view of this litigation as a complicated and expensive lawsuit to bring.

b.     Reaction of the Class to Settlement.

The Second Circuit has generally been of the view that a low objection rate by absent class members is supportive of a settlement agreement.  <u>See</u> <u>Wal-Mart Stores</u>, 396 F.3d at 118 ("'If only a small number of objections are received, that fact can be viewed as indicative of the adequacy of the settlement.'" (quoting 4 Alba Conte & Herbert B. Newberg, <u>Newberg on Class Actions</u> § 11.41, at 108 (4th ed. 2002)) However, the Circuit has also stated that a low response rate is the norm and should not be over-construed.  <u>See</u> <u>In re Traffic Exec. Ass'n—E. R.Rs.</u>, 627 F.2d 631 (2d Cir. 1980) ("A substantial lack of response from absentee class members appears to be the norm rather than the exception.").  Although the number of objectors is quite low relative to the size of the class—well under one percent of the total class—the court does not

believe that an inference of approval by way of silence is warranted, in light of the fact, inter alia, that notice of class action was sent simultaneously with notice of settlement. See In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liability Litig., 55 F.3d 768, 812-13 (3d Cir. 1995).[9]

Those who have objected to the settlement do so vociferously. They view the settlement as entirely too small—indeed to some of no value—to resolve claims that they believe to be worth substantially more than the value to them of two months membership. See, e.g., D. Crockett & S. Crockett Obj. (Doc. No. 73) ("Receiving a two month free membership with a $200/year membership fee is hardly a settlement for the cost we have incurred."). Many of the objectors view their claims to be worth at least the value of their membership initiation fees, which cost them thousands of dollars.[10] See, e.g., L. Minton Obj. (Doc. No. 75) ("The Settlement is inadequate. I would like a full refund of the initial membership fee of $5,000+.").

In further support of these dissenters, thirty-nine attorneys general have filed a brief in amicus curiae opposing the settlement. See Doc. No. 161. The attorneys general forcefully argue that the settlement is both overstated and undervalued. Id.

---

[9] An argument was made by West Virginia, and a couple of the represented objectors, that the notice sent to the class was insufficient. See B. Hebert Obj. 24-26 (Doc. No. 167); L. Sohl & P. Ganezer Obj. 12-13 (Doc. No. 149); W. Va. Obj. 10-14 (Doc. No. 107-9). If this is the case, it might account for the low objection rate. However, while the court has significant concerns about the Notice, for the purposes of this Ruling, the court will assume that notice was proper. See discussion, infra, at 31.

[10] The court does not view the fact that a little over two thousand former members have sought to receive the benefit of the class action as indicating a favorable view of the settlement by them. These class members might rationally accept the benefit of the settlement, while not viewing it as very valuable or even a reasonable settlement.

The court finds their Memorandum to be especially helpful and views it as a placeholder for many absent class members' objections.[11]  See Figueroa v. Sharper Image Corp., 517 F. Supp. 2d 1292, 1328 (S.D. Fla. 2007) (noting that objection to settlement agreement by thirty-five state attorneys general—"representing hundreds of thousands, if not millions, of eligible class members"—counseled against a finding of fairness).

Plaintiffs emphasize that a number of the objectors discuss facts, such as DirectBuy's aggressive sales tactics, which did not form the basis of the settled claims and would not be released.  Pls.' Mem. in Support at 53-58; see, e.g., P. Herter & C. Herter Obj. (Doc. No. 168) (discussing aggressive sales tactics and promise of "once in a life time opportunity"); Santucci Obj. 125 (Doc. No. 125) ("I was told after sitting in on a Direct Buy sales pitch for 3 hours that if I didn't sign the contract right then in there I would never be able to come back and get a membership. . . .  I was so afraid I was missing out on a good deal that I signed on the dotted line.").  As the court discussed, supra, for the purposes of this Ruling, it will construe the release narrowly.  This narrow construction does not, however, completely address these objectors' arguments.

First, the objectors' "misconception" (in plaintiffs' view) of the breadth of the Settlement Agreement is not necessarily unreasonable.  Rather, it resulted from a release that was poorly written by the parties, and it is a reading consistent with that

---

[11] In fact, in light of the media coverage of this Objection, an absent class member in one of these thirty-seven states, the District of Columbia, or Puerto Rico might reasonably assume that her interests are being protected by the involvement of her state's attorney general.  See, e.g., Michelle Singletary, Class-Action Coupon Settlements Are a No-Win for Consumers, Wash. Post, Apr. 28, 2011, at A14 (reporting that thirty-nine attorneys general oppose the instant settlement).

championed by defendants.  <u>See</u> discussion, <u>infra</u>, at 29-31.  The court will, therefore,

not dismiss the arguments as to the substantive unfairness of the Agreement out of

hand, simply because they do not argue directly to the narrow view of the release in

question.

Further, although some objectors focused on the sales tactics used to induce

their membership, the court imagines that any number of these objectors would not be

complaining, had they received the benefit of the bargain they believed they were

making with DirectBuy.  Even under plaintiffs' narrow construction of the release, then,

these objecting class members might be giving up a substantial portion of any fraud

claim they might otherwise have, by releasing any claim that DirectBuy failed to deliver

on its promise to sell to its members at the manufacturer's and supplier's price.

For all these reasons, this second <u>Grinnell</u> factor does not support approval of

the Settlement Agreement.  Even if the number of objectors is quantitatively low as a

percentage of the entire class, the reaction of those who did object and the forceful

brief filed by the thirty-nine attorneys general strongly recommend denial.

c.      The Stage of the Proceedings and Discovery Conducted.

As discussed, <u>supra</u>, this case has not progressed substantially.  Although

plaintiffs have conducted some confirmatory discovery, given the relatively early stage

of the proceedings, the parties, the objectors, and the court are not in a good position to

evaluate the strength of the claims released and the value of the settlement to the

class.  Again, the lack of formal discovery does not necessarily prevent this court from

approving settlement.  <u>See</u> <u>Plummer</u>, 668 F.2d at 658.  However, it does not weigh in favor of this court's approval.

> d.  Risks to the Class Associated with Proceeding to Trial.[12]

This next factor is essentially an evaluation of the strength of plaintiffs' claims. The court must consider the risks concomitant with pursuing this case, including the risk of plaintiffs' being unable to prove liability, to prove damages, and to maintain their class action through trial.  <u>See</u> <u>Wal-Mart Stores</u>, 396 F.3d at 118.  Unsurprisingly, both plaintiffs and defendants play up these risks and suggest that plaintiffs' claims are too weak to garner a substantial settlement award.  The court disagrees with this assessment, at least in part.

Plaintiffs engage in a detailed analysis of the claims underlying this action and the other settled actions.  <u>See</u> Pls.' Mem. in Support at 9-19.  They argue, and the court agrees, that there is a risk that plaintiffs will not be able to establish liability or damages. <u>Id.</u>  However, plaintiffs appear to overstate these risks.  Further, plaintiffs fail to account for the myriad of state consumer protection statutes that are available to class members and their impact on plaintiffs' risk assessment.

The claims purported to be settled by the Agreement can be placed into two categories: (1) claims that DirectBuy failed to disclose and disseminate various rebates and discounts received from manufacturers, <u>see, e.g.</u>, Compl. ¶ 48; and (2) claims that DirectBuy utilized freight and handling fees to overcharge its members, <u>see, e.g.</u>,

---

[12] The court here is combining three factors from <u>Grinnell</u>.  <u>See</u> <u>Wal-Mart Stores</u>, 396 F.3d at 118-19 (combining the fourth, fifth, and sixth <u>Grinnell</u> factors into one).

Vance Compl. ¶¶ 66-68 .  As to the first, plaintiffs argue that there will be serious

difficulties proving both liability and damages, see Pls.' Mem. in Support at 9-15, and as

to the second, plaintiffs contend that there were some factual problems uncovered in

the confirmatory discovery that might well eliminate these claims, id. at 16-20.  The

court recognizes that claims as to freight and handling may be weak, in light of the fact

that these fees have always been disclosed to members.  See Powell Aff. ¶ 15-17.

However, it is the court's view that plaintiffs overstate the weaknesses with respect to

the claims based on DirectBuy's receipt of rebates and discounts from manufacturers

and suppliers.

Plaintiffs first argue that there are factual limitations to their claim of fraud.  Pls.'

Mem. in Support at 10-13.  With respect to the money received from cooperative

advertising and other promotional allowances, DirectBuy claims that it did not "profit"

from this money, but that, instead, it used the funds to cover costs and create items

important to serving its customers, such as catalogs.  See Klotzbach Aff. ¶ 2; Powell

Aff. ¶ 10; Steinberg Aff. ¶ 2, Mar. 28, 2011 (Doc. No. 137-2).  Additionally, with respect

to DirectBuy's "prompt-pay" discounts, DirectBuy appears to insist that it has a right to

do what it wished with the payments made by its members toward products, including

generate additional funds via these prompt-pay discounts, provided it supplied the

customer with the product purchased.  Pls.' Mem. in Support at 12-13.

These arguments, however, are specious.  DirectBuy does not have the right to

expend its customers' money in whatever way it desired if doing so would be

inconsistent with a representation made to its customers.  As for how DirectBuy spent the money it received from manufacturers and suppliers, this argument appears to be little more than clever accounting.  Presumably these expenses would come out of DirectBuy's own assets if these discounts and allowances were required to be passed on to its members to reflect the "manufacturer's price."

Plaintiffs argue next that it would be difficult for them to establish fraudulent intent, as required by RICO.  Pls.' Mem. in Support at 13-14.  According to plaintiffs, DirectBuy's General Counsel, C. Joseph Yast, had advised DirectBuy that its practices with respect to rebates and discounts were entirely legal.  Id.  Of course, a jury or court does not have to agree with Yast's analysis.  However, even so, plaintiffs will face a hurdle proving that DirectBuy acted with fraudulent intent in light of Yast's advice.

Finally, plaintiffs argue that their claims are weak because plaintiffs may not be able to prove that the misrepresentations were material.  See id. at 14-15.  The size of these rebates and discounts are claimed to have amounted to no more than $53 million during the class period.  Klotzbach Aff. ¶¶ 3-6.  In light of the over $4 billion in products purchased by DirectBuy members during that period, id. at ¶ 6, these rebates and discounts amount to a markup of a little more than one percent.  Further, as of 2009, DirectBuy has been disclosing the existence of the rebates and discounts to its customers and claims that its membership numbers have not substantially changed, Powell Aff. ¶ 14, suggesting that the failure to disclose was not, in fact, material.

Although the court agrees that these facts relating to intent and materiality tend

to support the parties' argument that the claims in this case are weak, the court does not believe that full account has been taken of the impact of state consumer protection laws on the risks associated with the claims being released. As discussed, <u>supra</u>, as part of the settlement, class members would be giving up any state claims based on the same factual predicate as those underlying the claims in this case. A proper consideration of the standards of proof under these consumer protection statutes is, therefore, required before the risk to the class of recovering can be assessed. <u>See, e.g.</u>, <u>In re Mex. Money Transfer Litig.</u>, 164 F. Supp. 2d 1002, 1022-27 (N.D. Ill. 2000) (approving settlement after careful consideration of the strength of released state law claims); <u>Clement</u>, 176 F.R.D. at 29 (rejecting settlement, in part, because of failure to account for strength of state consumer protection claims).

Unlike RICO, many, if not most, state consumer protection statutes do not require consumers to prove that defendants acted with intent to violate the law. <u>See, e.g.</u>, <u>Associated Inv. Co. Ltd. P'ship v. Williams Assocs. IV</u>, 230 Conn. 148, 158 (1994) (holding that a claim under the Connecticut Unfair Trade Practices Act ("CUTPA") does not require proof of intent); <u>Hewlett v. Squaw Valley Ski Corp.</u>, 54 Cal. App. 4th 499, 520 (1997) (holding that a claim under Cal. Bus. & Prof. Code § 17200—alleged in the <u>Ganezer</u> Complaint—does not require proof of intent); <u>Huch v. Charter Commc'ns, Inc.</u>, 290 S.W.3d 721 (Mo. 2009) (holding that a claim under Mo. Rev. Stat. § 407.020—alleged in the <u>Randall</u> Complaint—does not require proof of intent); <u>Stutman v. Chem. Bank</u>, 95 N.Y.2d 24, 29 (2000) (holding that a claim under N.Y. Gen. Bus Law

§ 349 does not require proof of intent).[13]  The parties' arguments with respect to

materiality are similarly called into question by state consumer protection laws.  These

statutes often do not require proof of individual reliance and have lower standards of

proof for materiality than common law fraud.  See, e.g., Aurigemma v. Arco Petroleum

Prods. Co., 734 F. Supp. 1025, 1029 (D. Conn. 1990) ("Plaintiffs need not prove

reliance [under CUTPA] or that the alleged unfair or deceptive representation became

part of the basis of the bargain."); In re Tobacco II Cases, 46 Cal. 4th 298, 326-27

(2009) (holding that Cal. Bus. & Prof. Code § 17200 does not require proof of individual

reliance, and holding that a plaintiff need not prove that misrepresentation was the "sole

or even the predominant or decisive factor influencing his conduct"); Hess v. Chase

Manhattan Bank, USA, N.A., 220 S.W.3d 758, 773-74 (Mo. 2007) (holding that Mo.

Rev. Stat. § 407.020 does not require proof of individual reliance, and defining "material

fact" as "any fact which a reasonable consumer would likely consider to be important").

The court notes that these state consumer protection statutes may not be

suitable for litigation on a nationwide class action basis.  See, e.g., In re Grand Theft

Auto Video Game Consumer Litig., 251 F.R.D. 139, 154-161 (S.D.N.Y. 2008) (denying

certification of nationwide settlement class involving state consumer protection statute).

However, it appears to the court that they may be well suited for statewide class

actions, especially within the states with broadly written consumer protection statutes.

This attempt is already being made in California and Missouri.  See generally Ganezer

---

[13] The attorneys general, in their amicus brief, cite to more than a dozen different state consumer protection laws that also appear to no require proof of intent.  See AGs' Amicus at 26 n.19.

Compl.; Randall Compl.  Further, investigations by state attorneys general are under way in at least a couple states, and, in some states, consumer protection actions can be brought on behalf of consumers.  See, e.g., Compl., State ex rel. McGraw v. DirectBuy, Inc., No. 11-C-140 (W. Va. Cir Ct. filed Jan. 26, 2011) ("McGraw Compl.") (Doc. No. 107-2) (West Virginia enforcement lawsuit); Fairness Hr'g Tr. 46-49 (counsel on behalf of New York Attorney General discussing New York State investigation).

Therefore, in light of these statutes and the evidence that public and private attorneys are prepared to enforce them, class members appear to have substantially stronger claims than the RICO claims alleged in this case.  Because the parties seek to release these state claims via the Settlement Agreement, the strength of these claims must be accounted for in this court's analysis of the fairness, adequacy, and reasonableness of the Agreement.  See Clement, 176 F.R.D. at 29.

e.      Ability of Defendants to Withstand Greater Judgment.

This factor is not argued by the parties.  The court assumes, therefore, that defendants can withstand a greater judgment.

f.      Range of Reasonableness of Settlement.[14]

Finally, the court must attempt to determine the range of reasonableness for a settlement in this case, in light of the best possible recovery and the attendant risks of litigation already discussed.  See Wal-Mart Stores, 396 F.3d at 119.  Once the court has done so, it can examine whether the instant Settlement Agreement falls within this

---

[14] The court here is combining two factors from Grinnell.  See Wal-Mart Stores, 396 F.3d at 119 (combining the eighth and ninth Grinnell factors into one).

range.  Id.

Plaintiffs argue that the best possible recovery for the class is approximately $53 million, or the total amount defendants received from manufacturers and suppliers as discounts, rebates, or promotional allowances during the eight year class period.  See Pls.' Mem. in Support at 40-41.  This is, of course, a good reference point.  However, the court notes that class members expended several thousands of dollars to become members.  See Powell Aff. ¶ 3; see also, e.g., D. Crockett & S. Crockett ($4,000 sign-up fee); L. Minton Obj. ($5,000+ sign-up fee); P. Pelsinger Obj. ($3,000 sign-up fee). Many objectors have argued for the recision of their contracts and the return of their initiation fees.  See, e.g., D. Crockett & S. Crockett Obj.; L. Minton Obj.; see also Compl. ¶ 48(a) (accusing defendants of making false representations to induce membership and in exchange for membership fees).  In instances of fraud in the inducement, such recisionary relief may be wholly appropriate.  See, e.g., Restatement (Second) of Contracts § 164(1) ("If a party's manifestation of assent is induced by either a fraudulent or a material misrepresentation by the other party upon which the recipient is justified in relying, the contract is voidable by the recipient."); Munroe v. Great Am. Ins. Co., 234 Conn. 182, 188 n.4 (1995) ("As a matter of common law, a party to a contract . . . may rescind that contract . . . if that party's consent to the contract was procured either by the other party's fraudulent misrepresentations, or by the other party's nonfraudulent material misrepresentations.").  Therefore, the best possible recovery for the class may amount to well over $2 billion ($3,000 membership x

800,000 members).[15]

In light of this best possible recovery, the Settlement Agreement—which the court has calculated as being worth, at most, between $15 million and $27 million—appears quite small. Nonetheless, the Second Circuit has long held that even settlements which represent a fraction of the best possible result may be appropriate in light of the risks associated with bringing such claims. See Grinnell, 495 F.2d at 455 n.2 ("[T]here is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery."). The final Agreement might well be reasonable then, if, as plaintiffs argue, their likelihood of success is very low.

However, as previously discussed, the court believes that plaintiffs in this case have substantially undervalued the strength of the settled claims by failing to account for the lower standards of proof required by state consumer protection statutes. The court does not view these claims as so weak that it would be reasonable to settle claims arguably worth over $2 billion for, at most, only a hundredth of this amount.

Additionally, as discussed, supra, the settlement is valueless to more than half the class. Twenty-five percent of current DirectBuy members will likely opt not to renew their membership, Powell Aff. ¶ 8, suggesting that they would not view this settlement as any award at all. Further, every class member that has chosen to leave DirectBuy

---

[15] Indeed, defendants represented to the District Court for the Eastern District of Missouri that the damages which could be received against Missouri clubs were over $20 million. See Defs.' Notice of Removal (Doc. No. 157-2). There are currently 120 separate clubs in 35 different states. See Powell Aff. ¶ 2.

will be required to settle their claims in exchange for returning to a company that they presumably no longer want to be a part of.  This right to rejoin is not of a "value" that falls within the range of reasonable settlements, particularly in light of the class members' apparently viable claims under state consumer protection laws.

        g.     Conclusion.

Having considered the <u>Grinnell</u> factors, and for the reasons discussed, the court cannot conclude that this settlement falls within the range of reasonableness.  The parties' failure to account for nontrivial state consumer protection claims, their overstatement of the risks of success, and their relatively meager settlement in light of the best possible recovery, lead this court to the conclusion that this settlement does not satisfy the requirements of Rule 23, even under the narrow view of the release urged by plaintiffs.[16]  Plaintiffs' Motion for Final Approval is, therefore, denied.

        C.    <u>Issues the Court Does Not Address</u>

In light of this court's Ruling denying plaintiffs' Motion for Final Approval, the court does not need to address a number of issues raised by the parties and various objectors.

        1.     Scope of Settlement Agreement

Plaintiffs and defendants seriously dispute the breadth of the release in the instant Settlement Agreement.  As discussed, <u>supra</u>, the court does not need to resolve this dispute and assumes, for the sake of this Ruling, that plaintiffs are correct as to the

---

[16] Needless to say, under defendants' view of the scope of the release, the settlement is plainly not reasonable.

scope of the release.

The court notes that both parties make arguments in support of their view of the scope of the release. Defendants point out that the Second Circuit appears to both allow broad settlement releases and to interpret such releases broadly, in recognition of a defendants' frequent desire for the repose resulting from a global settlement. See, e.g., Wal-Mart Stores, 396 F.3d at 107 ("The law is well established in this Circuit and others that class action releases may include claims not presented and even those which could not have been presented . . . ."). Plaintiffs are correct, however, that the scope of the release in the present case can reasonably be read to include only claims of the nature of those alleged in the actions, and that the instant release does not purport to settle claims that could not have been brought in any of the settled actions, because they would not be suitable as class actions. See Settlement Agreement at 12 (purporting to settle claims "that were brought, or could have been brought, in the Actions").

Regardless of which party makes the better case, the court cannot but help notice that the efficiency of the judicial process loses either way. Ambiguity within the release of a class action settlement agreement all but requires future litigation. The court does not need to decide whether this disagreement over scope could affect the court's ability to review the Agreement. However, the court finds the fact that the parties cannot agree on the meaning of such an important aspect of the Agreement incomprehensible, and the court does not intend to approve any future settlement

agreements between the parties absent a more clearly written release.

### 2. Sufficiency of Class Notice

Several objectors, including the State of West Virginia, have taken issue with the class notice that was utilized in this case. <u>See</u> B. Hebert Obj. 24-26; L. Sohl & P. Ganezer Obj. 12-13; W. Va. Obj. 10-14. Again, the court does not need to address this issue. The court notes that, while email notice may not, on its own, be cause for concern, <u>see, e.g.</u>, <u>Radosti v. Envision EMI, LLC</u>, 717 F. Supp. 2d 37, 48 (D.D.C. 2001), the court has serious concerns with the initial email that was sent to the class without prior approval from Judge Garfinkel or this court. Particularly, the court is concerned that the fact that the email did not come directly from a DirectBuy email account would lead class members to ignore or delete the email, assuming that it was some sort of spam.[17]

### 3. West Virginia's Objection

Shortly after the Preliminary Approval was entered, the Attorney General for the State of West Virginia filed a lawsuit against DirectBuy, alleging claims arguably related to those in the present action. <u>See</u> <u>McGraw</u> Compl. Defendants filed a Motion asking Judge Garfinkel to enjoin the West Virginia action, which they argued would interfere with the instant Settlement Agreement. <u>See</u> Doc. No. 86. Judge Garfinkel signed the Proposed Order, <u>see</u> Doc. No. 89, and West Virginia subsequently filed an Objection, asking this court to vacate this Order, <u>see</u> Doc. No. 107.

---

[17] Indeed, at least one objector explains his late objection because the email was delivered to his spam file. <u>See</u> K. Pielak Obj. (Doc. No. 140).

The court does not need to address this Objection, which challenges, inter alia, Judge Garfinkel's order of injunction.  It does appear that the Magistrate Judge did not have the authority to issue the injunction; at most it was a recommended ruling, and thus no injunction issued.[18]  See 28 U.S.C. § 636 (prohibiting magistrate judge from acting on motion for injunctive relief or "to dismiss or permit maintenance of a class action," absent a referral from the district court); see also United States v. Erwin, 155 F.3d 818, 825 (6th Cir. 1998) (treating a magistrate judge's order that was outside the scope of his authority as void).  However, this issue is rendered moot by the court's instant Ruling.

## VI.    CONCLUSION

For all these reasons, the court denies plaintiffs' Motion to Approve the Final Settlement (Doc. No. 134).  The court further terminates as moot plaintiffs' Motions for Attorneys Fees and Class Representative Awards (Doc. No. 135, 136).

**SO ORDERED.**

Dated at Bridgeport, Connecticut this 16th day of May, 2011.

 /s/ Janet C. Hall
Janet C. Hall
United States District Judge

---

[18] The court appreciates the West Virginia Attorney General's voluntary suspension of its case in anticipation of the court's ruling on West Virginia's Objection or the court's denial of final approval of the Settlement Agreement.